Opinion by Judge SILVERMAN; Dissent by Judge REINHARDT.
OPINION
SILVERMAN, Circuit Judge:
It is undisputed that on December 18, 1985, appellant Richard Samayoa beat Nelia Silva to death with a wrench in the *920 course of burglarizing her home. Samayoa also beat to death Nelia’s two-year-old daughter, Katherine. The pathologist estimated that Nelia was struck in the head 24 times. The jury heard testimony that the faces of both mother and daughter were smashed in, their skulls crushed, and fragments of bone penetrated their brains. It is undisputed that Samayoa left Nelia and Katherine naked from the waist down — he said he did that to make the crime look like a rape — and then he stole jewelry from the Silva house that he gave away as gifts to members of his family. The mutilated bodies of both victims were found by Rolando Silva, Nelia’s husband and Katherine’s father. Photos of the decedents and of the bloody crime scene were introduced into evidence.
Nine years earlier, Samayoa had raped and sodomized a woman with multiple sclerosis, who begged him, “Please don’t rape me. I’m a cripple.” He was convicted of burglary and rape and sentenced to prison. Five years later, while staying overnight at a friend’s home, Samayoa entered the bedroom of the friend’s sister and smashed a flower pot in her face in an effort to rape her. She suffered a laceration of her face that penetrated to her cheek bone. He was convicted of assault with a deadly weapon and again sentenced to prison. Samayoa also had a prior conviction for another burglary. Altogether, he had been sentenced to prison three separate times.
At the trial of the double Silva murders, which Samayoa conceded he committed, defense counsel presented testimony from three psychologists and a written report from a fourth to the effect that Samayoa suffers from, among other diagnoses, an organic brain disorder that could explain his violence. In addition, at the penalty phase of the trial defense counsel presented evidence that Samayoa had been a compliant prisoner during his previous incarcerations, proving that he can be safely incarcerated. They also presented evidence from his mother and sisters to the effect that they loved him and hoped his life would be spared.
The jury returned a penalty phase verdict of death after about 80 minutes of deliberation.
Samayoa now claims that his two defense lawyers were ineffective at the penalty phase because they failed to discover and prove that when Samayoa was a child, his extended family physically fought with each other and abused drugs, as did he; that sexual abuse was prevalent in the family, and an uncle may have abused Samayoa at age eight or nine; that Samayoa’s family was poor; that his father was a harsh disciplinarian; and that his mother was “emotionally distant.”
On state habeas review, the California Supreme Court rejected the claim of ineffective assistance of counsel. It did so on the merits but without further explanation.
The question posed in the present federal habeas petition is whether the state court’s decision rejecting the ineffective assistance of counsel claim is contrary to or an unreasonable application of United States Supreme Court law. The district court assumed (without definitively deciding) that Samayoa’s trial lawyers fell below the standard of care in not presenting the evidence of Samayoa’s childhood at the penalty phase of the trial. However, the district court held that the state court was not unreasonable in denying relief because Samayoa cannot show that he was prejudiced by any supposed failings of counsel. In other words, in light of the atrociousness of the two Silva murders, the heinousness of Samayoa’s prior crimes, and the fact that counsel had already presented significant evidence of Samayoa’s organic brain disorder to the jury during the guilt phase, the California state court was not *921 unreasonable in deciding that there was no reasonable probability that the jury would have returned a different verdict had it heard the additional evidence about Samayoa’s childhood.
We agree with the district court that the California Supreme Court’s decision was not contrary to or an unreasonable application of Supreme Court law. The two murders themselves were uncommonly brutal, and the aggravating evidence horrific. If the evidence of an organic medical explanation for Samayoa’s behavior, which the jury did hear, did not persuade it to impose a lesser sentence, it was not unreasonable for the state court to decide that the additional evidence probably would not have produced a different verdict. We affirm.
I. Facts
A. The Crimes
In the direct appeal, the California Supreme Court set forth the facts of the crime:
In December 1985 Nelia Silva resided with her husband, Ronaldo [sic], and their two-year-old daughter, Katherine, on Piedra Street in Southeast San Diego. Defendant lived across the street from the Silva family. On the morning of December 18, 1985, Ronaldo [sic] Silva walked his daughter across the street to a babysitter’s home and left his daughter there. At approximately 6 p.m., Mrs. Silva returned from work and picked up her daughter from the babysitter.
Mr. Silva arrived home at approximately 7:30 p.m. that evening. He opened the garage door, observed his wife’s car parked in the garage, and smelled smoke. He entered the kitchen through the interior garage door and found smoke spewing from the stove top where food was burning. After calling out for his wife and receiving no response, he looked down the hallway and saw the bodies of his wife and daughter lying on the floor in pools of blood. After touching his wife and daughter, he realized they were dead and ran outside seeking help. At 8 p.m., San Diego Police Department officers arrived at the Silva residence and entered through the garage. They discovered the bodies of a small child and a woman lying in the hallway. The child was nude from the waist down, with a large indentation in her head. The woman also was nude from the waist down, wearing only a shirt, and her face was smashed.
Outside the residence, Mr. Silva was comforted by Raul and Deana Samayoa, defendant’s brother and sister. Raul and defendant lived across the street with their mother and other members of the Samayoa family.
Detective Richard Carey of the San Diego Police Department arrived at the scene at 9:35 p.m. Approaching the hallway from the kitchen, he observed large pools of blood in the area of the woman’s body and the child’s head, and blood spattered on the walls and in the three bedrooms off the hallway.
That evening a police department technician searched the area surrounding the Silva residence. He found a wrench and several pieces of jewelry on the ground near an area spattered with blood. He was unable to lift fingerprints from the wrench, the jewelry, or the interior of the residence. Missing from the house were a jewelry box and jewelry, and Mrs. Silva’s purse.
Blood samples taken from the two victims and from defendant all were determined to be type A. Mr. Silva knew of defendant, but neither he, nor to his knowledge his wife, ever had spoken with him.
A forensic pathologist, Dr. Robert Bucklin, performed autopsies on both victims. Mrs. Silva’s arms, hands, and fingers *922 were covered with multiple bruises and abrasions. She had been struck with blunt force on the head and neck approximately 24 times. Multiple blunt lacerations covered both sides of her head and scalp. Dr. Bucklin testified that a blunt laceration is a crushing type of injury made with a heavy force without a sharp edge. Her jaw bones and teeth were fractured and the left cheek bone was crushed. The eyes were crushed around the orbital ridges on both sides. Upon removal of the scalp, the pathologist observed several skull fractures, one of which had caused a piece of bone to penetrate the brain, and another serious fracture along the skull base that was caused by extensive force. The pathologist testified that Mrs. Silva would have died within several minutes following the infliction of her injuries. He further testified that the wrench (recovered from outside the residence) was consistent with and could have been the instrument that caused the injuries.
The autopsy of Katherine revealed three injuries, all blunt lacerations of the scalp. One injury on the right side was two inches long and penetrated the skull into the brain, producing hemorrhaging. The most severe injury fractured the skull base. The brain contusions caused hemorrhaging and edema. The wrench was consistent with, and could have been, the instrument that caused the injuries.
A criminalist with the district attorney’s office developed a crime scene reconstruction, determining that Mrs. Silva had received many blows while she was lying on the floor. Katherine had been struck once while near the left leg of her mother and then moved along the hallway, smearing blood on the wall, where she was struck again. Following the commission of the crimes, defendant gave various items of jewelry to family members. He gave his mother, Mercedes Samayoa, a hair comb, and gave his sister, Deana, a pearl necklace and a bracelet. Defendant’s other sister, Inez Sykes, found a man’s diamond gold ring sitting on her bathroom counter. Defendant told her that the ring belonged to him. Each of these items of jewelry later was identified as belonging to Mr. or Mrs. Silva.
In January 1986, following defendant’s arrest for a violation of his parole in another criminal case, his mother and his sister alerted the police that defendant had given them items of jewelry. On January 20, 1986, Officers Art Beau-dry and Ronald Jordan met with defendant’s mother, brother, and sisters at the Samayoa residence and collected the jewelry. After the officers informed the Samayoas that a jewelry box also was missing, Raul Samayoa discovered it wrapped in a blanket under a shed in the Samayoa backyard. When shown the wrench that was discovered outside the Silva residence, Raul Samayoa told the officers that it appeared similar to the one he had kept in his tool shed.
People v. Samayoa, 15 Cal.4th 795, 64 Cal.Rptr.2d 400, 938 P.2d 2, 13-16 (1997).
On January 31, Samayoa confessed to the killings.
B. The Trial
Defense counsel’s strategy at the guilt phase of the trial (a strategy that is not challenged here) was to concede that Samayoa had killed the victims and to present for Samayoa a diminished capacity defense aimed at negating the allegations of the special circumstances[1] that would make the case a capital one if proven. *923 In his opening statement to the jury, defense counsel conceded defendant’s guilt of two counts of first degree murder and one count of residential burglary. Counsel asserted that evidence of defendant’s brain damage would be presented to establish that at the time of his commission of the crimes, defendant lacked the intent to kill his victims (which intent was, at the time of the commission of the crimes, an element of the burglary-murder special-circumstance allegation) (see People v. Anderson (1987) 43 Cal.3d 1104, 240 Cal. Rptr. 585, 742 P.2d 1306). Thereafter, in support of this theory, the defense presented at the guilt phase the testimony of two psychologists, who testified that the results of neuropsychological tests administered to defendant indicated the presence of organic brain damage.
Dr. Meredith Friedman, a licensed clinical psychologist and chief psychologist at the Metropolitan Correctional Center, testified she had been retained by the defense to conduct preliminary neuropsychological testing of defendant. Dr. Friedman explained that the field of neuropsychology involves the relationship of cognitive and perceptual behavior to underlying brain dysfunction. In August 1986, Dr. Friedman conducted a battery of neuropsychological tests, including the Luria-Nebraska series, the Canter Background Interference Procedure, and the Bender-Gestalt visual motor test. (She acknowledged she had no formal training in the administration of the Luria-Nebraska tests.) She also analyzed the results of tests conducted one month earlier, applying the Wechsler Adult Intelligence Scale. Additionally, Dr. Friedman interviewed defendant regarding his history of head injuries, and defendant disclosed he had been rendered unconscious in a bicycle accident at 13 years of age, and again in 1972, when he was struck on the head by a billy club wielded by a police officer.
According to Dr. Friedman, the test results indicated global intellectual deterioration and brain damage associated with the left parietal, occipital, temporal, and frontal lobe areas of the brain, which would cause hypersensitivity, unmodulated reaction, and overreaction in novel or stressful situations. Such brain damage also would cause episodes of “rage reaction,” resulting in an explosive lack of control, and panic in “fight or flight” situations. Dr. Friedman also testified that defendant demonstrated “viscosity,” signifying that he obsessively pursued or repeated a single function or response — an action consistent with temporal lobe damage.
Dr. Saul Saddick, a licensed clinical psychologist, testified that he specialized in neuropsychological assessment, although he does not hold a board certification in neuropsychology. Dr. Saddick administered to defendant the Halsted-Reitman battery of tests and interviewed him regarding his history of head injuries. Dr. Saddick testified that the test results indicated brain damage to the frontal, temporal, and parietal lobes of the brain, which would cause poor impulse control, impairment of reasoning skills, low frustration tolerance, assaultive behavior, and a “short fuse” profile, consistent with frontal temporal damage. Defendant also demonstrated “viscosity” and “perseveration,” signifying that once engaged in an activity such as aggressive behavior, he would have difficulty discontinuing his actions. Viscosity and *924 perseveration were consistent with left temporal lobe damage. Defendant’s confession to the police was indicative of viscosity, in that his statement was a monologue unresponsive to questions asked, and he spoke in repetitive circles. Persons with the type of brain damage suffered by defendant may experience episodes of “rage reactions,” and according to Dr. Saddick it is difficult to determine whether a person locked into a rage reaction is aware of his conduct or, if aware, is able to stop his conduct. He acknowledged that defendant was aware of the difference between killing someone and inflicting serious bodily injury. Dr. Saddick ultimately diagnosed defendant as having an (1) organic “explosive type” personality syndrome, (2) antisocial personality disorder, and (3) moderate cerebral dysfunction.
The parties stipulated that People’s exhibit No. 66 was a drawing by defendant of the court reporter, given by defendant to her. The parties further stipulated that Dr. Dixon, the psychologist retained by the district attorney’s office who tested defendant on February 3, 1986, observed during the Rorschach test that defendant often perseverated, indicating “organicity” (i.e., brain damage), the origin of which could be alcohol or drug abuse.
Samayoa, 64 Cal.Rptr.2d 400, 938 P.2d at 16-17.
The government presented two experts to rebut the defendant’s brain damage evidence. Id., 64 Cal.Rptr.2d 400, 938 P.2d at 17-18. On surrebuttal, the defense presented an additional expert:
Dr. Melvin Schwartz, a clinical neuropsychologist and forensic psychologist who was board certified in neuropsychology, examined the same materials reviewed by the other experts. Dr. Schwartz agreed with Dr. Saddick’s conclusion that defendant suffered left hemisphere brain damage. Behavior of the type demonstrated by defendant (viscosity and perseveration) frequently was demonstrated by brain-damaged individuals. He opined that Dr. Saddick competently had administered the tests in the present case, although Schwartz had found errors in Saddick’s work in another case.
Id., 64 Cal.Rptr.2d 400, 938 P.2d at 18.
The jury deliberated for about 45 minutes and found Samayoa guilty of two counts of first degree murder and one count of residential burglary. The jury also found that Samayoa used a deadly weapon (the wrench) during the crimes, had served three prior prison terms, and had two prior serious felony convictions. Finally, the jury found true the multiple-murder special circumstance allegation- — • i.e., that in the present case, Samayoa was convicted of more than one count of murder. It also found true the felony murder special circumstances — i.e., that each murder was committed in the course of a burglary. Id., 64 Cal.Rptr.2d 400, 938 P.2d at 13.
The penalty phase of the trial then commenced before the same jury. The state presented the following evidence in aggravation:
The 1976 preliminary hearing testimony of Berta Lou Raymond in a prior unrelated criminal prosecution for burglary and rape was read to the jury. (Raymond was deceased and therefore unavailable as a witness.) Raymond testified that she suffered from multiple sclerosis and usually was confined to a wheelchair. On July 8, 1975, at 2:15 a.m., she was at home alone asleep in bed. She was awakened by the sound of the bedroom door opening, and a flashlight was shined in her face. She could hear two men but could not see them. One of the men held a knife at *925 her throat, asking her where she kept her money. When she heard a belt buckle being loosened and a zipper unzip, she screamed, “Please don’t rape me, Pm a cripple.” A male voice responded, “I know, I won’t hurt you.” The man then removed his pants and raped her. At one point he turned her over and entered her rectum with his penis. The initial act of intercourse lasted approximately 15 to 20 minutes. Another man repeatedly entered the bedroom, referring to the man who was raping her as “Jack.” She heard a total of three different voices.
David Drew Anderson was one of the participants in the Raymond burglary and had pleaded guilty to the crimes. In the present proceedings, at the penalty phase of defendant’s trial, Anderson testified that on July 7 and 8, 1975, he had been with defendant and James Glasgow, drinking and ingesting heroin. Defendant, recently having been released from custody, needed money. Both defendant and Glasgow lived in close proximity to Raymond, and the three men decided to burglarize her house. They agreed to use fictitious names in the event they needed to communicate with each other while inside the residence. Defendant entered first and began to rape Raymond. Anderson disclosed for the first time (i.e., at the penalty phase of the trial in the present case) that he and Glasgow also had sexually assaulted Raymond. In 1976, Anderson had denied culpability for the rape in order to avoid prosecution for that offense.
The prosecution also presented evidence of defendant’s 1981 conviction for assault with a deadly weapon on Elvira R. Rosendo R., the brother of the victim, testified that on the evening of November 13, 1981, he returned from a party, accompanied by defendant. They both fell asleep in Elvira’s bedroom. Elvira was alone in her bedroom, asleep.
Elvira testified that she was awakened that evening by someone striking her. Her assailant threatened that he would kill her if she pulled down the covers, and said he wanted to make love to her. When she jumped up, he responded by forcefully striking her in the face. She saw his face and recognized him, crying out, “Oh my God Richard.” After she begged him to allow her to wipe her face, he allowed her to leave the room. She was taken to the hospital that evening for treatment for severe lacerations on her face, requiring stitches.
Finally, the prosecution also introduced evidence of defendant’s 1974 burglary conviction.
Id., 64 Cal.Rptr.2d 400, 938 P.2d at 18-19.
In presenting the case in mitigation, defense counsel built upon the brain damage evidence previously presented, adding testimony from corrections officers and family members.
Paul Dillard, a counselor with the Department of Corrections, testified that in 1981, while defendant was a prison inmate, defendant held a position in the prison kitchen, demonstrating his reliability and responsibility.
Ronald Baldwin, an officer at a correctional facility, testified that he had daily contact with defendant for nearly a year in 1983, and that defendant had been a cooperative, above-average worker.
Id., 64 Cal.Rptr.2d 400, 938 P.2d at 19. Similarly, Robert Smith, a retired corrections officer from Soledad Correctional Training Facility, testified that Samayoa worked on his prison crew six hours a day for approximately a year. Smith rated Samayoa’s job performance as “very satisfactory.”
*926 Samayoa’s mother, Mercedes, and two sisters, Inez and Deana, testified. Their testimony was designed to humanize Samayoa and elicit sympathy and mercy for him and his family. They testified that Samayoa was an artist who loved his family. Mercedes identified drawings and hand-made cards Samayoa had made and sent to her and family photographs, including pictures of Samayoa as a child. Mercedes also identified photos the family sent to Samayoa while he was in prison. Similarly, Deana identified a card Samayoa had sent to her. Deana also testified that Samayoa had a seven-year-old son, and Samayoa and his son loved each other very much. Inez and Deana testified that they had cooperated with the police but loved Samayoa and hoped his life would be spared.
The jury deliberated for 80 minutes before returning a death penalty verdict.
Samayoa filed a post-verdict motion to reduce his sentence to a life sentence. The trial court independently reweighed aggravating and mitigating evidence and denied the motion, concluding that the death penalty was “the only fitting response” to the “unspeakable crimes” and that aggravation “vastly outweigh[ed]” mitigation. Id., 64 Cal.Rptr.2d 400, 938 P.2d at 44-46. As aggravation, the trial court cited the “overwhelming” evidence of the special circumstances, the “viciousness and brutality of the crimes,” the fact that Samayoa “bludgeoned” the victims “to death in the course of ... a burglary,” and the “prior violence against highly vulnerable female victims.” Id., 64 Cal.Rptr.2d 400, 938 P.2d at 45.
C. State Appellate and Post Conviction Proceedings
The California Supreme Court unanimously affirmed the convictions and sentence on direct review. Id., 64 Cal.Rptr.2d 400, 938 P.2d at 49. The Supreme Court reviewed the motion to reduce sentence and held that the trial court did not abuse its discretion when it reweighed the aggravating and mitigating factors and concluded that the “aggravating circumstances ‘vastly outweigh the mitigating circumstances.’ ” Id., 64 Cal.Rptr.2d 400, 938 P.2d at 46.
Samayoa filed his first state habeas petition with the California Supreme Court in 1997, arguing that counsel was ineffective for failing to investigate and present mitigation evidence. On February 23, 1998, while the state habeas petition was pending, the United States Supreme Court denied certiorari on Samayoa’s direct appeal. Samayoa v. California, 522 U.S. 1125, 118 S.Ct. 1071, 140 L.Ed.2d 131 (1998). On September 27, 2000, the California Supreme Court denied the ineffective assistance habeas claim “on the merits,” without explanation.
D. Federal Habeas Petition
Samayoa filed his first federal habeas petition on January 28, 2002, and amended it in 2005, claiming that counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase. He filed numerous supporting affidavits providing additional social history. Several family members stated that Samayoa had grown up witnessing violent fights among extended family members, using drugs, and drinking alcohol. One uncle admitted that he and his brothers had tossed Samayoa around like a ball when he was an infant. Several family members claimed that Samayoa’s mother, Mercedes, was unaffectionate towards him. Samayoa’s father, Ralph, was a disabled war veteran who received disability income and had serious health problems until his 1982 death. Samayoa and his two brothers stated that their father harshly disciplined them. According to Samayoa’s two brothers and mother, one time Ralph disci *927 plined Samayoa by putting Samayoa’s hands into a flame as punishment for either burning their father’s five homing pigeons alive or for killing a cat. Two cousins stated that Samayoa told them over phone from prison that he had been molested by the uncle at age 9. Samayoa admitted only that the uncle once attempted to molest him. Other relatives described pervasive sexual abuse in the extended family.
Marion Pasas, the defense investigator, signed an affidavit, stating that the investigation was “not as thorough as [she] felt it should be” and that lead counsel, Michael Popkins, did not spend time with Samayoa’s family. Assistant defense counsel, Michael Marrinan, stated in his affidavit that, although he had worked with mental health experts to prepare for trial, he was unaware of abuse in Samayoa’s family. Had Marrinan known about abuse, he would have presented the facts to the experts, and to the jury as mitigation evidence.
E. District Court’s Ruling
The district court accepted all of the affidavits as true, and assumed without deciding that the defense investigation fell below the objective standard of reasonableness. However, the district court held that the California Supreme Court was not unreasonable in deciding that Samayoa suffered no prejudice from the supposed failings of counsel.
The district court assumed that trial counsel could have presented all of the new mitigating evidence, and the court considered it in combination with the previously presented evidence, which included (1) expert testimony that Samayoa suffered head injuries which caused brain damage and caused Samayoa to suffer a “rage reaction” on the night of the murders; (2) testimony by prison officials that Samayoa was a productive prison worker, indicating that he could be safely incarcerated; (3) testimony by Samayoa’s two sisters and mother that Samayoa sent them hand-made cards and letters from prison, that his child loved him, and that they felt guilty for having helped convict him; and (4) counsel’s arguments that Samayoa helped the police by confessing and that he did not intend to kill the victims.
The district court then weighed all of this evidence against the aggravating evidence. The court noted that the crime in this case involved an extremely brutal double murder of a mother and two-year-old daughter who were bludgeoned to death with a wrench during a burglary. Both victims were half-dressed and both had been struck many times while lying on the floor. Samayoa subsequently gave the jewelry he stole to members of his family. In addition, the court considered the previous burglary, sexual assault, and assault with a deadly weapon convictions. Considering the extremely violent nature of the murders and his prior crimes, the district court concluded that even if the additional mitigation had been presented to the jury, there was no reasonable possibility that one of the jurors would have voted for life. The district court added that the jurors deliberated on the guilt verdict for less than 45 minutes and on the penalty for less than an hour and a half. The court concluded that the California Supreme Court’s rejection of the ineffective assistance claim involved neither an unreasonable determination of the facts nor an unreasonable application of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
II. Analysis
A. Standard of review
The Antiterrorism and Effective Death Penalty Act applies to this case. Woodford v. Garceau, 538 U.S. 202, 207, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). A *928 federal court may not grant habeas relief unless the decision of the state court “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). We review the district court’s denial of the habeas petition de novo. Wilson v. Czerniak, 355 F.3d 1151, 1154 (9th Cir.2004). Because the California Supreme Court denied the ineffective assistance of counsel claim without explanation, we independently review the record to determine whether the state court unreasonably applied Strickland. Id. “We do not independently decide the contested legal question, but focus on whether the State Court decision should be reversed under the § 2254 standard.” Id. (citing Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000)).
The clearly established law in this case is the two-prong Strickland test. Wiggins v. Smith, 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). To prevail on the first Strickland prong, Samayoa must establish that counsel acted below the objective standard of reasonableness by not conducting a more thorough background investigation. Porter v. McCollum, — U.S. -, 130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009). The critical issue is whether, applying prevailing professional norms, trial counsel conducted an objectively reasonable investigation for mitigating evidence. Id.; Wiggins, 539 U.S. at 522-23, 533, 123 S.Ct. 2527. Our review “includes a context-dependent consideration of the challenged conduct as seen ‘from counsel’s perspective at the time,’ ” rather than in hindsight. Wiggins, 539 U.S. at 523, 123 S.Ct. 2527.
To assess prejudice, we consider the mitigating evidence that was presented along with the new mitigating evidence and reweigh all of it against the aggravating evidence to determine whether there is a “reasonable probability” that it would have produced a different verdict. Sears v. Upton, — U.S. -, 130 S.Ct. 3259, 3266-67, 177 L.Ed.2d 1025 (2010); Wong v. Belmontes, — U.S. -, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009). Of course, we must consider the totality of the evidence before the jury when determining prejudice. Berghuis v. Thompkins, - — U.S. -, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (2010).
B. Analysis
It is not at all clear that counsel should • have been expected to do more to uncover the evidence that Samayoa now claims should have been presented.[2] However, *929 like the district court, we will assume without definitively deciding that counsel should have found and presented the additional evidence now in issue. We agree with the district court that the California Supreme Court was not unreasonable in deciding that the additional evidence of Samayoa’s childhood probably would not have caused a different verdict to be rendered. Here’s why:
• The crimes were brutal and horrendous: not just one murder but two, of a mother and her child, and for no other reason than to steal jewelry from their house.
• Samayoa’s prior record was also brutal and horrific, terrible crimes marked by vicious cruelty. His three previous trips to prison had not prevented the murders of Nelia and Katherine Silva.
• The jury had been presented with other mitigating evidence, including substantial evidence from psychologists purporting to link Samayoa’s violence to an organic brain injury. That evidence was “more significant[ ]” than the “[ejnvironmental factors” he now proffers. Sears, 130 S.Ct. at 3262. Prison officials called Samayoa a reliable worker, and his immediate family showed sympathetic cards and photographs and described how Samayoa’s son loved him.
• The evidence of Samayoa’s childhood does not paint a pretty picture, but it is not so dramatic or unusual that it would likely carry the day for Samayoa given that his much more probative brain injury evidence did not. His story, sadly, is not an uncommon one: harsh discipline, poverty, drug abuse, and violence and sexual abuse among extended family members. It is not clear whether Samayoa was actually sexually abused by an uncle or if the uncle merely made an unsuccessful attempt. Either way, it was a one-time event that pales in persuasive force compared to evidence of organic brain dysfunction that failed to move the jury. Faced with a similar situation in Wong v. Belmontes, the Supreme Court said that it was “hard to imagine” that additional facts about Belmontes’ difficult childhood would outweigh the facts of the murder he committed — a crime similar to Samayoa’s. 130 S.Ct. at 391. Belmontes beat a woman to death with a steel dumbbell bar, crushing her skull with 15 to 20 blows. Id. at 390. Samayoa crushed the skulls of tivo people, inflicting 24 blows to the head of the mother and beating to death her helpless young daughter.
III. Conclusion
In the final analysis, the question is not whether we think that the newly-developed mitigating evidence would have averted a verdict of death. We do not think so, but that is not what matters. What matters is whether the California Supreme Court was unreasonable in deciding that the additional evidence would not likely have caused *930 the jury to reach a different verdict. For the reasons we have given, we hold that the California state court’s decision was not an unreasonable application of, or contrary to, United States Supreme Court law.[3]
AFFIRMED.

. The special circumstances alleged were multiple murders and murders in the course *923 of a burglary.

. The heart of Samayoa's claim is an affidavit of the defense investigator, Marion Pasas, stating that the investigation was "not as thorough as [she] felt it should be" and that lead counsel, Michael Popkins, did not spend time with Samayoa’s family. But, Pasas's opinion — which is only an opinion — is directly contradicted by the record, which establishes an early mitigation investigation and numerous meetings between counsel and Samayoa. Popkins started the mitigation investigation two years before trial, meeting with the investigator, discussing mitigating evidence with both the investigator and Samayoa, and reviewing prison and criminal records in 1986. Pasas’s 1987 letter to Popkins, sent a year before trial, establishes that she had interviewed immediate and extended family members for mitigation and was obtaining school records. According to Pasas, the family was "very quiet" and did "not give up information easily,” the father was "absent most of the time,” and the mother was "extremely passive.” All of the mental health experts testified at trial that they reviewed school records when they tested Samayoa.
Popkins’s contemporaneous notes show 66 meetings with Samayoa before the penalty trial, including meetings to discuss mitigation evidence two years before trial. Similarly, Michael Marrinan's notes show that he met 49 times with Samayoa. Between them, they also interviewed Samayoa’s mother, grandmother, aunt, godchild, sisters and brothers *929 before the penalty trial. Despite all of these meetings — some specifically to discuss mitigation — none of Samayoa's immediate family members state that counsel and the investigator failed to ask about abuse or family history. Other relatives were asked to provide information that would put Samayoa in a positive light. During one interview, counsel apparently asked an aunt to provide only such information. But none of Samayoa’s relative volunteered anything about the abuse they now describe.
After years of investigation, defense counsel has not identified any documents revealing "red flags” of abuse that would require further investigation, either. Rompilla v. Beard, 545 U.S. 374, 382-93, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding that counsel should have reviewed school and prior conviction records); Wiggins, 539 U.S. at 524-25, 123 S.Ct. 2527 (holding that counsel should have further investigated where social services records revealed abuse).

. We decline to issue a certificate of appealability for the uncertified issue briefed by Samayoa.