IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81018-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| LIND, WILLIAM JAY, | ) | |
| DOB: 01/24/1982, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — William Jay Lind appeals his jury conviction for third degree rape. He argues the trial court erred by admitting inculpatory custodial statements after he asked to speak with the officer "off the record." Because Lind did not invoke his right to remain silent and the officer did not engage in deception or misrepresentation about Lind's constitutional rights, we affirm.

## FACTS

On the morning of August 8, 2018, 36-year-old Lind was working for a construction company remodeling a family's house. The family's 18-year-old daughter J.L.S. had just returned home to live with her mother and stepfather after being away for about a month. J.L.S. woke up to find Lind entering her bedroom. He said he had to work on a closet. J.L.S. immediately got up and went to the restroom. No one else was home.

Lind made flirtatious and sexual advances to J.L.S. throughout the morning. Around 12:30 p.m., Lind attacked J.L.S. in her bedroom and raped her.

Citations and pin cites are based on the Westlaw online version of the cited material.

J.L.S. texted her sister and asked her to come pick her up. J.L.S. said that it was an "emergency" and that she was "scared." While driving away from the home, J.L.S. told her sister that Lind had raped her. They drove to the emergency room for a sexual assault examination. At the hospital, J.L.S. reported the rape to medical staff and the police.

During the police investigation, Lind gave officers three statements, two of which officers recorded, after they advised him of his constitutional right to remain silent and right to an attorney. Before trial, the State moved to admit all of Lind's statements to police. The court held a CrR 3.5 hearing. It considered testimony from the three officers who took statements from Lind.

Deputy Robinson Interview

Snohomish County Sherriff's Deputy Lucas Robinson testified that he read Lind Miranda[1] warnings when he arrested Lind at his home and placed him in handcuffs. Deputy Robinson read from a preprinted card and told Lind:

> "You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning if you wish. You can decide at any point to exercise these rights and not answer any questions or make any statements."

Lind told the deputy he understood these rights and when asked if he wished to talk, "he immediately started talking." Deputy Robinson testified that at no point in their conversation did Lind invoke his right to an attorney or invoke his

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

right to remain silent.  When they arrived at the jail, Deputy Robinson asked Lind if he would be willing to speak with a detective and Lind said, " 'Yes.' "

Detective Bittinger Interview

Detective Myles Bittinger testified that he then took custody of Lind and Lind agreed to speak with him at the jail.  Detective Bittinger gave Lind a consent form for a recorded interview.  A section of the form advised Lind of the same rights Deputy Robinson read to him earlier.  Detective Bittinger read the form out loud as Lind followed along.  Lind acknowledged that he understood his rights and said that he was willing to speak with the detective.  Lind also signed the form both before he made any recorded statements and "at the conclusion of the interview."  Detective Bittinger testified that Lind expressed no confusion about his rights and did not invoke his right to counsel or his right to remain silent.

Detective Bittinger used a department-issued Apple iPhone to record his interview with Lind.  At one point, an incoming call interrupted the recording.  Detective Bittinger stopped the recording and made a record of the interruption.  Lind did not make any statements to the detective while the recorder was off.

Later, Lind asked the detective if he could " 'tell [him] something off the record.' "  Detective Bittinger turned off the recorder on his iPhone and showed Lind that it was off.  Lind then asked the detective if he thought Lind had "done it."  The detective said he did and asked Lind "how he thought [J.L.S.] was feeling right now."  Lind responded, " '[O]h God, I am such a piece of shit.' "

Detective Bittinger told the court he did not restart the recording or re-advise Lind of his rights because Lind "continued speaking," which the detective

"took . . . to mean that [Lind] was satisfied with what had transpired and was comfortable asking me the question at that point." Because of the "nature" of the unrecorded questions and statements, Detective Bittinger felt it important to note them in his report.

<u>Detective Bennett Interview</u>

Detective David Bennett testified that he and Detective M. Flolid interviewed Lind at the sheriff's office about three weeks later. The detectives used the same form Detective Bittinger used to advise Lind of his rights and to obtain Lind's consent to a recorded interview. Lind again said he understood his rights to an attorney and to remain silent, did not invoke his rights, and agreed to a recorded interview.

Lind did not testify at the CrR 3.5 hearing. The trial court ruled that all of Lind's statements were voluntary and admissible in the State's case in chief.[2] It reasoned that the officers advised Lind of his rights at each interview and that Lind expressed he understood his rights and did not invoke them. The court also determined that Lind's request to talk "off the record" was not an unequivocal invocation of his right to remain silent. The court entered findings of fact and conclusions of law.

A jury convicted Lind of third degree rape. Lind appeals.

---

[2] The court redacted portions of each interview that it later admitted at trial.

ANALYSIS

Lind argues the trial court erred by admitting statements he made after asking to speak to Detective Bittinger "off the record." He also challenges several of the trial court's findings of fact.

Findings of Fact

"We review challenged findings of fact for substantial evidence, that is, enough evidence to persuade a fair-minded rational person of the truth of the finding. We treat unchallenged findings as verities on appeal." State v. Allen, 138 Wn. App. 463, 468, 157 P.3d 893 (2007).[3]

Lind challenges three of the trial court's factual findings:

26. When the recorded interview was concluded, the Defendant asked Deputy Bittinger if he could speak with him "off the record."
27. The deputy agreed and showed the Defendant that the recorder was no longer recording.
28. The Defendant had previously been advised that anything he said could be used against him.

Substantial evidence supports each of these findings. Detective Bittinger testified that at the end of the recorded interview, Lind asked the detective if he could " 'tell [him] something off the record.' " Detective Bittinger turned off the recording on his iPhone and showed Lind that it was off. And all three interviewing officers told Lind before they asked any questions that " '[a]nything you say can be used against you in a court of law.' " He received the same admonishment twice in writing.

---

[3] Citation omitted.

Admissibility of Custodial Statements

Lind argues the "erroneous admission of [his] apparent confession to rape was Miranda error that is not overcome by overwhelming untainted evidence." We disagree.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." To counteract the inherent compulsion of custodial interrogation, police must administer Miranda warnings. Miranda, 384 U.S. at 467. Under Miranda, police must inform a person in custody before interrogation that he has a right to remain silent and to have a lawyer present. Miranda, 384 U.S. at 469-70. Once a suspect unambiguously invokes his right to remain silent, police may not continue an interrogation or make repeated efforts to "wear [him] down." State v. I.B., 187 Wn. App. 315, 320, 348 P.3d 1250 (2015). But where an accused makes an ambiguous or equivocal statement about invoking his rights, officers need not ask clarifying questions or stop the interrogation. Berghuis v. Thompkins, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).[4]

We consider the totality of the circumstances when determining whether an accused unequivocally invoked his rights. See State v. Hodges, 118 Wn. App. 668, 671, 77 P.3d 375 (2003). This is an objective inquiry. Davis v. United States, 512 U.S. 452, 458-59, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). A person unequivocally asserts his right to remain silent only where his invocation

---

[4] Berghuis applied the unambiguous/unequivocal invocation standard announced in Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (determining whether the defendant invoked the right to counsel), to determine whether the defendant invoked the right to remain silent.

is clear enough that "a reasonable police officer in the circumstances" would understand the statements to be an assertion of that right.  Davis, 512 U.S. at 459.

> "[A] suspect does not invoke his or her right to remain silent merely by refusing to allow the tape recording of an interview, unless that refusal is accompanied by other circumstances disclosing a clear intent to speak privately and in confidence to others."

State v. Piatnitsky, 170 Wn. App. 195, 226, 282 P.3d 1184 (2012) (quoting People v. Samayoa, 15 Cal. 4th 795, 829-30, 938 P.2d 2 (1997), aff'd by Samayoa v. Ayers, 649 F.3d 919 (9th Cir. 2011)), aff'd, 180 Wn.2d 407, 325 P.3d 167 (2014); see also State v. O'Neal, 392 S.W.3d 556, 570 (Mo. Ct. App. 2013) (Defendant's statement that "he was willing to tell his story, so long as it was not audio-recorded," was not an invocation of his right to remain silent.); Jones v. State, 344 Ark. 682, 689-90, 42 S.W.3d 536 (2001) (Concluding that the defendant's request to turn off the tape recorder was not an unequivocal invocation of his right to remain silent because "[h]e never indicated that he did not wish to talk, only that he did not wish what he said to be recorded.").

Here, like the cases cited above, Lind asked only if he could tell Detective Bittinger something "off the record."  The detective showed Lind that he was no longer recording the conversation and Lind continued to speak.  A reasonable officer under these circumstances would not believe Lind made an unequivocal assertion of his right to remain silent.

Citing United States v. Harris, 72 F. Supp. 3d 1332 (M.D. Ga. 2014), Lind suggests that Detective Bittinger deceived him into speaking because Lind clearly misunderstood that anything he said "off the record" could be used

7

against him. In Harris, the defendant was reluctant to continue talking to officers because " 'all of the things I'm telling you are probably going to hurt me.' " Harris, 72 F. Supp. 3d at 1335. He told officers he would only continue to talk " 'off the record.' " Harris, 72 F. Supp. 3d at 1335. Officers responded, " '[S]ure.' " Harris, 72 F. Supp. 3d at 1335. When Harris asked for a second confirmation that their conversation was " 'off the record,' " officers stated, " '[O]kay, off the record.' " Harris, 72 F. Supp. 3d at 1335. The court suppressed the defendant's statements because the officers led Harris to believe they would not use his statements against him, and "intentionally false representations directly contradicting a Miranda warning are never appropriate." Harris 72 F. Supp. 3d at 1337.

Harris' comments suggested he believed only recorded statements would " 'hurt' " him, and the officers unlawfully fostered that belief. Unlike Harris, Lind did not suggest that he believed no one could use his "off the record" statements against him. And there is no evidence that Detective Bittinger engaged in any misrepresentation or deception. He did nothing to induce Lind to speak to him and did not foster a belief that their conversation would be secret or that no one would use Lind's statements against him. The court did not err in admitting Lind's statements.

Even so, any error by admitting Lind's "off the record" statements was harmless. We apply a harmless error analysis to erroneous admissions of statements obtained in violation of Miranda. State v. Reuben, 62 Wn. App. 620, 626, 814 P.2d 1177, review denied, 118 Wn.2d 1006, 822 P.2d 288 (1991). We

8

presume constitutional error is prejudicial, and the State bears the burden of proving that the error was harmless. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d 321 (1986). A constitutional error is harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error. Guloy, 104 Wn.2d at 425. Under the "overwhelming untainted evidence" test, we look only at the untainted evidence to determine whether it is so overwhelming that it necessarily leads to a finding of guilt. Guloy, 104 Wn.2d at 426. Under this test, we will reverse a conviction where there is a reasonable chance that the use of inadmissible evidence was necessary to reach a guilty verdict. Guloy, 104 Wn.2d at 426.

Here, Lind admitted that he engaged in sexual intercourse with J.L.S. The sole issue at trial was whether the intercourse was consensual. J.L.S. testified that she did not consent to have sex with Lind. She told Lind "no" several times but he continued to assault her.

Other evidence supported J.L.S.' claim. Her sister testified that she received text messages from J.L.S. shortly after the rape stating that "something with the construction worker happened, something bad," that J.L.S. needed to be picked up right away, that it was an "emergency," and that she was "scared." As they drove away from the house, J.L.S. told her sister that Lind raped her. They drove to the hospital, where a forensic nurse gave J.L.S. a sexual assault examination. The nurse testified that J.L.S. appeared to be sad, tired, and "just kind of numb." J.L.S.' description of the rape to medical staff was consistent with

9

her testimony at trial. Detective Bittinger also interviewed J.L.S. at the hospital. J.L.S.' account of the rape relayed to the detective was consistent with her testimony at trial.

Lind also made several statements during the recorded part of his interview that were similar to his "off the record" comment that " 'I am such a piece of shit.' " He told Detective Bittinger that if J.L.S. would have told him to stop, "it would've been over and I would've felt like a jackass and probably left." Referring to what he believed was consensual sex with a virtual stranger as a married man, Lind told officers he "feel[s] like a fucking tool" and "shouldn't have done it in the first place." Later, he repeated he "felt like an ass" after having sex with J.L.S. because he "ma[d]e out with her" even though he "barely kn[e]w her name." Finally, Lind confided that a member of his own family was a molestation survivor and the current accusation would ruin him. The court admitted all of these statements at trial.[5] Defense counsel argued to the jury that Lind's statements showed he regretted cheating on his wife and feared he would "get in trouble for having sex on the job" with someone he had just met who was also "the homeowner's daughter."

The potentially tainted evidence was substantially repetitive of the untainted evidence. We are convinced a reasonable jury would have reached the same result regardless of Lind's "off the record" statements. As a result, any error was harmless.

---

[5] Lind also testified at trial.

We affirm Lind's conviction for third degree rape.

_____
Brennan, J.

WE CONCUR:

_____        _____