Salvador A. RODRIGUEZ, Petitioner,

v.

Derral ADAMS, Warden, Respondent.

No. C 04–2233 PJH.

United States District Court,
N.D. California.

June 1, 2011.

Linda Ann Fullerton, Attorney at Law, Pt. Richmond, CA, for Petitioner.

Moona Nandi, CA Attorney General's Office, San Francisco, CA, for Respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

PHYLLIS J. HAMILTON, District Judge.

Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner, Salvador Rodriguez ("Rodriguez"). Having reviewed the parties' papers, and having carefully considered their arguments, the record, and the relevant legal authorities, the court hereby GRANTS the petition.

## BACKGROUND

On July 8, 1998, Rodriguez was charged with murder under California Penal Code § 187, along with enhancements that during the commission of the murder, he intentionally discharged a firearm and proximately caused death under California Penal Code § 12022.53(d); that he used a firearm under California Penal Code §§ 1203.06 and 12022.5; and that he inflicted great bodily injury under California Penal Code § 1203.075.

On January 20, 2000, an Alameda County Superior Court jury convicted Rodriguez of second degree murder with the use of a firearm to proximately cause death, but found the allegation of infliction of great bodily injury to be untrue. The trial court sentenced Rodriguez to state prison for a term of 40 years to life.

Rodriguez unsuccessfully appealed his conviction to the California Court of Appeal, and the California Supreme Court denied review on February 13, 2002.

Rodriguez subsequently filed a state habeas petition with the Alameda County Superior Court, which the court denied. He then filed a habeas petition with the California Court of Appeal, and that court issued a postcard denial. On February 4, 2004, the California Supreme Court also summarily denied Rodriguez's petition for state habeas relief.

Rodriguez then filed a petition for federal habeas relief with this court on June 7, 2004.

### A. Factual Background

On the evening of March 3, 1998, in Oakland, California, Rodriguez shot and killed Frederick Walker ("Walker"). Prior to the shooting, a group of neighborhood youths including Roy Ramsey, Vonree Alberty, Kenneth Jackson, Thurston Breshell, Marcus Hawkins, and Albert Bagwell (referred to collectively as the "Melrose group") were hanging out in and around a car (the "Jackson–Alberty car") on the 4700 block of Melrose Avenue, also the block on which Rodriguez lived, near Hawkins' house. Shortly before 6:00 p.m., a station wagon with approximately nine or ten African–American teenagers [1] (the "Walker group" or "Walker car") drove down Melrose Avenue, from 47th to 48th Avenues and made a u-turn on 48th Avenue. The teenagers in the Walker group

---

1. Witnesses gave varying numbers, and it was never established exactly how many people comprised the Walker group.

were not from the neighborhood. Among others, the Walker group included the driver, Damon Brown; Brown's cousin, Ferrari Johnson; the victim, Frederick Walker; and the victim's brother, David Walker.

The Walker station wagon first parked near a stop sign on 48th Avenue. The occupants of the Walker car then exited the vehicle and approached the Melrose group. After the Walker group converged on the Melrose group, the groups then split. Ramsey, a member of the Melrose group, walked down the street and was subsequently surrounded by members of the Walker group. Breshell, Alberty, and Jackson, other members of the Melrose group, remained in or around the Jackson–Alberty car and were also approached by members of the Walker group.

The timing of the subsequent events is a bit unclear. Members of the Walker group "relieved" Ramsey of three dime bags of marijuana.[2] Around the same time, a member of the Walker group went back to their station wagon, and pulled it along-side, apparently double-parking next to the Jackson–Alberty car. Two members of the Walker group then began hassling Breshell.

After the Walker group took the marijuana from Ramsey, Ramsey walked across the street to Rodriguez's house, and went up to Rodriguez, who had exited his house after hearing loud noises. Ramsey told Rodriguez that he had just been robbed by the Walker group. At this point, Rodriguez observed a tussle between Breshell and members of the Walker group. Ramsey subsequently gave Rodriguez a gun, and Rodriguez then shot up in the air several times in an attempt to scare away the Walker group. One of

these shots hit the victim, Walker, in the head and killed him.

## B. Trial Proceedings

### 1. Prosecution Key Witnesses

#### a. Jewel Marshall

The prosecution called Jewel Marshall, a neighbor of Rodriguez's who lived on Melrose Avenue. Marshall testified that he was at home on the evening of the shooting, and that after hearing loud voices outside, he looked out of his front window to see what was going on. Marshall testified that he observed at least two African–American teenagers standing near a station wagon parked in front of his driveway in the street, and that he saw another group of teenagers standing by the stairs to his neighbor Marcus Hawkins' house, including Hawkins, Bagwell, and Ramsey.

When Marshall first looked out the window, he testified that there did not seem to be a fight or an altercation between the two groups of people, and he did not see any weapons, so he left his window and went about his business. However, he subsequently heard gunshots and then went back to his window. While he was away from the window, Marshall could still hear that there was a conversation outside, but reported that the tone subsequently increased in urgency.

When he went back to the window after hearing the shots, he saw the teenagers that had been surrounding the Walker station wagon run away at the sound of the gunfire. Marshall testified that he observed Rodriguez shooting the gun. Marshall also observed one of the fleeing teenagers fall to the ground in the street. After the shooting, Marshall witnessed a

---

**2.** Ramsey testified at a preliminary hearing that he was robbed, but the prosecution argued at trial that there was no admissible evidence that a robbery occurred, based largely on the fact that the defense did not call Ramsey to testify at trial.

fist fight break out among the Walker group and the Melrose group.

### b. Armando Salazar

The prosecution also called Armando Salazar, another Melrose Avenue resident, and a neighbor of Rodriguez's. Salazar arrived home at 5:45 p.m. on March 3, 1998. While he was still in his vehicle in front of his house, he noticed the Walker group's station wagon parked in front of his neighbor and prosecution witness, Marshall's house, and he subsequently saw nine or ten African–American teenagers jump out of the station wagon. At that point, Salazar entered his home because he had never seen the teenagers before, and told his wife to collect their kids from the backyard because the strange teenagers in the street made him nervous. However, Salazar testified that the teenagers were not fighting at that time.

When the Walker teenagers exited the station wagon, Salazar saw that one of them had a beer and another one urinated on a lawn. He testified that the teenagers were loud, but that he did not see any weapons on the Walker group, and that he did not observe the group fighting before the shots were fired. Salazar did not observe an altercation until he heard a gunshot three or four minutes later. At that point, he looked out of his kitchen window and observed Rodriguez holding a gun. When Rodriguez finished shooting, he turned and walked back into his house.

Salazar testified that he saw the teenagers run away when the shooting started. Subsequently, the members of the two teenage groups started fighting.

### c. Officer Morse

Officer Morse participated in pulling over the Walker station wagon containing Walker group members Ferrari Johnson and Damion Brown after the shooting. He testified that the officers did not find a weapon in the Walker car.

### 2. Defense Witnesses

Rodriguez's defense was that he fired the gun to protect his friends from members of the Walker group, who were robbing them. Only Rodriguez and Breshell testified for the defense.

### a. Thurston Breshell

Breshell testified that he was present on the 4700 block of Melrose Avenue at the time of the March 3, 1998 shooting. He attested that he and Ramsey were standing outside of a car occupied by Alberty and Jackson when they saw the Walker station wagon drive by.

Breshell testified that the car drove by slowly, and that he observed someone who appeared to be laying down suspiciously in the back seat of the car. Breshell then saw the Walker car make a u-turn on 48th Avenue and park near the stop sign at the corner. At that point, Breshell testified that five people got out of the station wagon, broke a wine bottle, talked to Hawkins, and approached the Melrose group. According to Breshell, their group then split: one group remained at the Jackson–Alberty car and the other group moved in front of Marshall's house.

Then, a member of the Walker group went back to their station wagon and pulled it "halfway on the side of the" Jackson–Alberty car. Breshell described the atmosphere as "hostile" when the Walker car pulled alongside the Jackson–Alberty car. After pulling to an abrupt stop, the driver of the Walker car exited the car and talked loudly to Breshell. At this point, Breshell saw Ramsey walking towards Rodriguez's house. Breshell did not see Ramsey get robbed.

The Walker group then grabbed Breshell and tried to get into his pockets. As

Breshell was trying to fight off two members of the Walker group, Alberty and Jackson drove away in their car. Breshell testified that he saw a third member of the Walker group, who might have been the victim, approach him, and also saw this person reach in his jacket for a gun. Breshell testified that he saw the handle of a gun tucked into the waistband of this person's pants. Breshell punched this approaching member of the Walker group before he could get the gun out of his pants.[3]

Breshell then heard a gunshot and ran away. He ran towards Rodriguez's house. The members of the Walker group who had been attacking Breshell then drove away in their station wagon. Breshell testified that he thought Rodriguez was protecting him (Breshell) when he fired the shots, including the one that hit Walker.

Breshell testified that he then went inside Rodriguez's house and was there when the police arrived. Breshell stated that he never talked to the police even though he had been personally involved in the altercation. He explained that the police make him nervous.

### b. Rodriguez

Rodriguez testified that he was in his bedroom between 5:00 and 6:00 p.m. on March 3, 1998, when he heard loud noises from outside the house. He left his bedroom and his house, and walked down toward the street on Melrose Avenue to investigate.

When he got to the street, he saw "a lot of commotion." Rodriguez observed some people whom he recognized, including Breshell, Ramsey, Jackson, Hawkins, and Bagwell, and five other people that he did not recognize. He did not see any fighting when he first observed the large group of people.

Rodriguez testified that Ramsey crossed the street and approached him, as Rodriguez kept an eye on the altercation between the Melrose group and the Walker group. Rodriguez testified that Ramsey then told him that he had just been robbed.[4]

Rodriguez then observed the Walker group start to "go[ ] through [Breshell's] pockets," and saw Breshell struggling with the Walker group. Ramsey shouted to the Walker group to leave Breshell alone because Ramsey was the one with marijuana.

Rodriguez knew that Ramsey had a gun and asked Ramsey why he had not used it against the Walker group as they were robbing him. Rodriguez then told Ramsey to shoot the gun in the air to scare off the Walker group, but Ramsey instead pushed the gun into Rodriguez's hands. Rodriguez saw the Walker group crossing the street toward him, and he twice fired the gun into the air. Two teenagers retreated, but two continued to hassle Breshell. Rodriguez told the remaining two to "get off" Breshell, and when they did not, Rodriguez fired the gun three more times at approximately a twenty-degree angle.

Rodriguez conceded that he never observed a gun on any member of the Walker group, but nevertheless testified that he shot the gun to protect Breshell. He thought that the altercation between the Walker group and the Melrose group was "more than a fist fight."

---

3. The court notes that at trial, the prosecution emphatically argued that the Walker group had no guns or weapons.

4. Because it was hearsay, the trial court admitted Rodriguez's testimony regarding what Ramsey told him not for the truth but to explain Rodriguez's state of mind, and the jury was given a limiting instruction to that effect.

### 3. Prosecution Rebuttal

In rebuttal, the prosecution called two officers to testify in order to call into question Breshell's credibility. Officer Bardsley, the officer who canvassed the neighborhood after the shooting to get statements from potential witnesses, testified that he entered Rodriguez's home to interview people at the residence and he did not observe any African–American males at that house. In other words, Bardsley did not see Breshell, who had earlier testified that he was present when the police came to Rodriguez's house. Sergeant Holloman similarly testified that he did not see Breshell when he conducted interviews at Rodriguez's house.

### 4. Closing Arguments

During closing arguments, the prosecution conceded that the case "made no sense," and argued that the victim was dead because of "a senseless act." Although it did not offer a motive for the shooting, the prosecution emphasized that the shooting was not justified or excusable, nor did it constitute a crime committed in the heat of passion or a case of imperfect self-defense.

The defense, on the other hand, argued that the use of deadly force was justified because Rodriguez was defending Breshell, who was being robbed. In her closing argument, counsel argued that Rodriguez had just been told by Ramsey that Ramsey had been robbed right before he approached Rodriguez, immediately prior to Rodriguez personally observing his friend, Breshell, in an altercation with two members of the Walker group, who appeared to be robbing Breshell.

### C. Federal Habeas Proceedings

This case has a somewhat long and convoluted history before this court.

On June 7, 2004, Rodriguez filed his original pro se habeas corpus petition in this court. The handwritten petition appeared to include two grounds for relief: (1) a claim based on trial counsel's failure to investigate, and (2) a claim that the state trial court erred in giving a jury instruction. In addition to his handwritten petition, Rodriguez attached eight exhibits, A–H, which he had previously submitted to the California Supreme Court with his state habeas petition.

On July 6, 2004, this court issued an order dismissing the petition with leave to amend, noting that it could not determine the nature of the claims from the petition. Subsequently, on August 11, 2004, the court received a letter from William Foskett ("Foskett"), an investigator who had previously been assigned to Rodriguez's case by the Alameda County Public Defender's office. As background, Foskett noted that he had worked as an officer for the Oakland Police Department for twenty years, subsequently worked as an investigator for the Alameda County Public Defender's Office, and later earned a law degree. Foskett's letter to the court detailed his concerns about the way Rodriguez's case had been handled by his trial counsel, Pauline Weaver. Foskett asked the court to pay special attention to Rodriguez's case, and requested that the court appoint counsel for him.

On October 26, 2004, the court issued an order granting an extension of time for Rodriguez to amend the original petition. The court noted that its prior order had been returned as undeliverable, and the clerk sent another copy of the prior July 6, 2004 order to the address previously supplied by Rodriguez. Additionally, the court asked that another copy be sent to Foskett to ensure that Rodriguez would receive it.

On November 1, 2004, in response to the order, Foskett sent another letter to the court providing an updated address for Rodriguez. Foskett also stated in the letter that Rodriguez did not have the intellectual capacity to prosecute his habeas case and again requested the court to appoint counsel for Rodriguez.

On November 24, 2004, Rodriguez, still pro se, filed an amended petition. In the amended petition, Rodriguez asserted that he was entitled to relief based on claims that:

(1) his counsel was ineffective in failing to hire an investigator to investigate the facts of his case, as detailed in a letter from Foskett;

(2) the trial court erred in giving incomplete instructions and in not giving him a copy of one of the instructions; and

(3) his trial counsel had a conflict of interest because Rodriguez had discharged her earlier in the case.

Rodriguez attached the same typewritten document that accompanied his original petition. Additionally, he included another letter from Foskett detailing the weaknesses that Foskett perceived in the defense's pretrial investigation of Rodriguez's case.

On December 12, 2004, the court issued an order to show cause requiring the state to respond to issues one and three, but dismissed the second issue regarding the jury instructions because it did not present a federal constitutional issue. On June 20, 2005, the state filed a motion to dismiss for failure to exhaust, in which it argued that one of the two remaining claims—that regarding Rodriguez's trial counsel's alleged conflict of interest—was unexhausted in state court. Therefore, the state argued that the case should be dismissed until Rodriguez exhausted the conflict of interest claim in state court.

Rather than opposing the state's motion to dismiss, Rodriguez sent the court two letters, one on August 25, 2005, and another on December 22, 2005, requesting a status report for his case. Additionally, on January 3, 2006, Foskett wrote another letter to the court on behalf of Rodriguez's mother requesting a status report.

Rodriguez ultimately failed to oppose the state's motion to dismiss, and on March 13, 2006, the court granted the state's motion to dismiss the conflict of interest claim as unexhausted with leave to amend. In light of Rodriguez's pro se status, the court carefully delineated Rodriguez's three options going forward, noting that he could: (1) voluntarily dismiss the case and exhaust the unexhausted claim in state court; (2) amend the petition to delete the unexhausted issue so that the court could proceed on the one exhausted issue; or (3) ask the court for a stay of the federal proceedings to afford him the opportunity to exhaust the second claim in state court.

On March 27, 2006, Rodriguez submitted a letter to the court requesting to amend his petition to remove the unexhausted claim regarding his trial counsel's alleged conflict of interest. In a March 30, 2006 order, the court treated Rodriguez's letter as an adequate amendment, deemed the petition amended, and directed the state to file an answer to Rodriguez's petition within sixty days. Accordingly, only the ineffective assistance of counsel claim remained.

After the state filed its answer and the state court record on May 2, 2006, Rodriguez filed a two-page handwritten response on June 8, 2006, that purported to be his traverse. In support, Rodriguez appended another letter from Foskett. Foskett had apparently reviewed the state's answer and drafted a letter to Rodriguez analyzing the state's arguments and

advising him how to proceed. Rodriguez's traverse paraphrased Foskett's letter.

On May 28, 2006, Rodriguez filed a motion requesting the court to appoint him counsel. Rodriguez stated that he did not have the requisite legal knowledge to adequately proceed with his habeas petition. Subsequently, on January 26, 2007, the court received another letter from Foskett. This letter, similar to many of the previous letters, explained Foskett's role in the original investigation of the case and Foskett's opinions about the quality of the defense. Additionally, Foskett reiterated his belief that the court should appoint Rodriguez counsel.

On March 1, 2007, the court granted Rodriguez's request for appointment of counsel and stayed the habeas proceedings pending such appointment. On April 26, 2007, after counsel was appointed for Rodriguez, the court issued an order for supplemental briefing by Rodriguez, allowing newly appointed counsel to supplement the traverse that Rodriguez had previously filed pro se because the original traverse was inadequate.

On September 17, 2007, with the assistance of his appointed counsel, Rodriguez filed a supplemental traverse and a request for an evidentiary hearing. Rodriguez elaborated on his ineffective assistance of counsel claim, asserting that his trial counsel was ineffective for (1) failing to present testimony from witnesses who were located and interviewed by Investigator Foskett prior to trial, who he claimed would have supported his defense that the homicide was justified, including Roy Ramsey, Elaine Caufield, and Dennis Lyons; and (2) for failing to locate and investigate additional witnesses who were available and who would have testified that Rodriguez's role in the homicide was justified, including Kenneth Jackson and Vonree Alberty.

Rodriguez argued that the additional witnesses would have substantiated the defense's position that the victim and/or the victim's friends were committing a robbery or robberies at the time the victim was shot. Accordingly, Rodriguez contended that the additional witnesses would have supported his defense at trial that the homicide was justified in that he acted reasonably in the defense of another, or alternatively, that the evidence would have supported a conviction on the lesser-included offense of voluntary manslaughter by suggesting to the jury that Rodriguez acted honestly but unreasonably in the defense of another or in the heat of passion.

In support, Rodriguez attached six exhibits to his supplemental traverse, which were not previously a part of this court's record, nor were they a part of the record before the California Supreme Court. Those exhibits included: (1) a September 9, 2007 declaration from Scott Whitney; (2) a September 10, 2007 declaration from Vonree Alberty; (3) a September 16, 2007 declaration from Kenneth Jackson; (4) a May 3, 1999 interview report of Dennis Lyons; (5) a September 16, 2007 declaration from Foskett; and (6) a May 7, 1999 interview report for Elaine Caufield.[5]

On September 26, 2007, the court issued an order for further briefing and for additional documents from the state court record. The court noted that in his petition and the papers filed to date, Rodriguez had contended that he received ineffective assistance of counsel based on his trial counsel's failure to adequately investigate the facts of his case, a claim which had been detailed in Foskett's supporting letters. However, in his supplemental tra-

---

5. Caufield has since passed away.

verse, the court noted that Rodriguez argued as well that trial counsel's failure to present evidence at trial (including witnesses who had been interviewed) constituted ineffective assistance of counsel. In an effort to determine whether the issue, as framed by Rodriguez in his supplemental traverse, was exhausted before the state courts, the court ordered the state to submit the actual order from the California Court of Appeal and a copy of Rodriguez's February 7, 2003 state habeas petition. The court further afforded the state the opportunity to respond to Rodriguez's supplemental traverse and request for an evidentiary hearing.

On November 11, 2007, the state filed another motion to dismiss Rodriguez's habeas petition as untimely and unexhausted. It argued that as framed by Rodriguez's supplemental traverse, his ineffective assistance of counsel claim was unexhausted, and that to the extent he sought to raise a new, unexhausted claim, it was untimely because it fell outside of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") statute of limitations.

On March 4, 2008, 2008 WL 619020, following Rodriguez's opposition and the state's reply, the court stayed the federal habeas proceedings so that Rodriguez could return to state court to fully exhaust the claim. In concluding that a stay was appropriate, the court held that the new evidence and arguments presented by Rodriguez in his supplemental traverse, although related to his claim before the state court, placed his ineffective assistance of counsel claim in a significantly stronger evidentiary posture. Specifically, the court noted that only two witnesses testified at trial in support of Rodriguez's position that the victim was shot in the defense of others who were being robbed by the victim and the victim's friends at the time of the shooting—Rodriguez and

Thurston Breshell. Four of the supplemental exhibits submitted to this court—the declarations and interview memoranda from Alberty, Jackson, Caufield, and Lyons—corroborated Rodriguez's and Breshell's testimony and provided additional details regarding the scene of the crime, including the alleged robberies, Rodriguez's conduct, and the conduct of the numerous other witnesses present that day. The court noted that those exhibits also corroborated the preliminary hearing testimony of Roy Ramsey, whose failure to testify at trial provided the underlying factual basis for Rodriguez's state court ineffective assistance of counsel claim.

Additionally, in granting the stay, the court noted that following exhaustion, Rodriguez would be permitted to amend his federal habeas petition to include the newly exhausted claim. In support, it concluded that because the claim contained in his pro se amended federal petition and the claim detailed in his supplemental traverse were tied to a common core of operative facts, the exhausted claim would relate back to the timely-filed claim stated in Rodriguez's November 24, 2004 amended habeas petition.

Rodriguez subsequently presented the claim to the California Supreme Court, along with all of the additional exhibits that he filed with his supplemental traverse before this court. On July 15, 2009, the California Supreme Court summarily denied his habeas petition.

On July 24, 2009, this court reopened the case, and noted that the state had not previously had an opportunity to address Rodriguez's supplemental traverse on the merits. The court thus afforded the state an opportunity to file a supplemental opposition brief, and for Rodriguez to file a supplemental reply, which both parties did.

## ISSUE

Rodriguez claims that his trial counsel provided ineffective assistance of counsel when she failed to adequately investigate and present testimony from numerous additional witnesses who would have supported Rodriguez's defense.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because the petition in this case was filed after the effective date of the AEDPA, the provisions of that act apply here. *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under the AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ A state court decision is "contrary to" Supreme Court authority, falling within the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Clearly estab-

lished federal law" under § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). This "clearly established" law "refers to the holdings, as opposed to the dicta, of [Supreme] Court decisions as of the time of the relevant state court decision." *Id.*

■ "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 74, 123 S.Ct. 1166. However, this standard "requires the state court decision to be more than incorrect or erroneous." *Id.* For the federal court to grant habeas relief, the state court's application of the Supreme Court authority must be "objectively unreasonable." *Id.* at 74–75, 123 S.Ct. 1166. The "objectively unreasonable" standard is different from the "clear error" standard in that "the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." *Id.* at 75, 123 S.Ct. 1166; *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003). Therefore, "[i]t is not enough that a habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous ... Rather, the habeas court must conclude that the state court's application of federal law was objectively unreasonable." *Andrade*, 538 U.S. at 75, 123 S.Ct. 1166; *see also Clark*, 331 F.3d at 1068.

■ As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a habeas petition by a state prisoner unless the adjudication of a claim

on the merits by a state court resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of facts in light of the evidence" under § 2254(d)(2). *See Torres v. Prunty*, 223 F.3d 1103, 1107–1108 (9th Cir.2000). To grant relief under 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." *Id.* at 1108.

■ However, when the state court decision does not articulate the rationale for its determination or does not analyze the claim under *federal* constitutional law, a review of that court's application of clearly established federal law is not possible. *See Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir.2000). When confronted with such a decision, a federal court must conduct an independent review of the record and the relevant federal law to determine whether the state court's decision was "contrary to, or involved an unreasonable application of, "clearly established federal law." *Id.* at 982.

> When a state court does not furnish a basis for its reasoning, we have no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context.... [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can

view it through the 'objectively reasonable' lens ground by *Williams*[, 529 U.S. 362, 120 S.Ct. 1495].... Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.... Only by that examination may we determine whether the state court's decision was objectively reasonable.

*Id.*

## DISCUSSION

### A. Supplemental Exhibits

As noted, Rodriguez submitted numerous exhibits with his federal habeas petition and supplemental traverse that were also submitted to, and which this court must presume to have been considered by, the California Supreme Court in conjunction with his May 27, 2003, and November 10, 2008 state habeas petitions. Because all of the exhibits in the record in this case were also in the record before the state courts that adjudicated Rodriguez's claim on the merits, this court's review and consideration of those exhibits is in accordance with the United States Supreme Court's recent decision in *Cullen v. Pinholster*. *See* —— U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2001) (clarifying that the record under review in federal habeas proceedings is limited to the record that was before the state court that adjudicated the petitioner's claim on the merits).

Among these were Exhibits A–F, which are briefly described below.[6]

---

**6.** Rodriguez also filed two additional exhibits, G and H, with his state and federal court habeas petitions. Exhibit G is a copy of the Alameda County Superior Court's October 15,

2002 minute order denying his habeas petition. Exhibit H is a printout of the California Court of Appeal's February 13, 2003 denial of his habeas petition.

### i. Exh. A: Transcript of Ramsey's Preliminary Hearing Testimony

Rodriguez argues that given that his defense counsel was unsuccessful obtaining Ramsey's testimony at trial, then, at a minimum, she should have sought to introduce Ramsey's preliminary hearing testimony. This exhibit is the transcript of that testimony.

### ii. Exh. B: February 18, 1999 Transcript of Undated Law Enforcement Interview with Ramsey

This is a transcript of an interview that the police conducted with Ramsey following the shooting.

### iii. Exh. C: May 5, 1999 Report of Interview with Roy Ramsey by Investigator Foskett

Foskett provided this report to Rodriguez's trial counsel. In the report, he evaluates Ramsey's demeanor, which he describes as "ok [ ] for a dope dealer." The report also states that the Walker group robbed Ramsey, and that Ramsey observed the Walker group with at least four guns.

### iv. Exh. D: April 17, 2003 Declaration from Petitioner Salvador Rodriguez

This declaration was initially submitted with Rodriguez's state habeas petitions.

### v. Exh. E: Investigator Foskett's Log of Handwritten Notes re: Investigation of Rodriguez's Case

Foskett's notes catalogue his efforts to contact various witnesses prior to trial.

### vi. Exh. F: May 24, 2003 Declaration from Sandra Gillies

Gillies was Rodriguez's attorney on direct appeal in the state appellate courts. Among other things, Gillies attests that she inquired of Rodriguez's trial attorney, Pauline Weaver, regarding why Weaver did not seek to introduce Ramsey's preliminary hearing testimony at trial. Gillies states that Weaver told her that Ramsey's testimony seemed "too thin" to have had an impact on the jury.

In addition to the above exhibits, Rodriguez also attached six exhibits to his September 17, 2007 supplemental traverse before this court, which he subsequently submitted to the California Supreme Court with his November 10, 2008 state habeas petition.

Those exhibits included the following:

### vii. Exhibit AA: September 16, 2007 Declaration of Scott Whitney [7]

Whitney is a private investigator hired by Rodriguez's appointed federal habeas counsel, Linda Fullerton. His declaration details how he contacted and interviewed two witnesses whom Rodriguez's trial counsel failed to locate and interview, Vonree Alberty and Kenneth Jackson. Whitney's interviews with Alberty and Jackson are detailed in the declarations located at Exhibits BB and CC.

### viii. Exhibit BB: September 10, 2007 Declaration of Vonree Alberty

As noted, Scott Whitney, the investigator hired by Rodriguez's habeas counsel, obtained a statement from Alberty on September 10, 2007. Alberty was present at the scene of the shooting.

---

**7.** These exhibits were labeled in the same manner as the prior eight exhibits. In order to distinguish the latter-filed exhibits from the former ones, the court has referred to the latter-filed exhibits as Exhibits AA, BB, CC, DD, EE, and FF.

### ix. Exhibit CC: September 16, 2007 Declaration of Kenneth Jackson

As noted, Scott Whitney, the investigator hired by Rodriguez's habeas counsel, obtained a statement from Jackson on September 16, 2007. Jackson was present at the scene of the shooting.

### x. Exhibit DD: May 3, 1999 Interview Report from Investigator Foskett re: Dennis Lyons

This is a report from Foskett regarding his pretrial interview with witness Dennis Lyons. Briefly, the report states that Lyons could testify that the Walker group was armed and committing robberies at the time of the shooting.

### xi. Exhibit EE: September 16, 2007 Declaration from Walter Foskett

This declaration details deficiencies in Rodriguez's trial counsel's performance that Foskett observed and reported. Specifically, Foskett states that he interviewed Lyons and Caufield, but that neither testified at trial. Additionally, Foskett describes how defense counsel instructed him to cease his efforts to subpoena Ramsey and Lyons for trial. Finally, Foskett states that, during the course of the investigation, he brought his concerns about defense counsel's performance to the attention of the Assistant Public Defender but that no reassignments were made based on his complaint.

### xii. Exhibit FF: May 7, 1999 Interview Report from Walter Foskett re: Elaine Caufield

This is a report from Foskett regarding his interview with witness Elaine Caufield. The report states that Caufield heard loud voices coming from the street. She then went outside and witnessed a fight and some shooting. Specifically, she noted that one of the males she observed was armed, but she wasn't clear regarding whether he was a member of the Walker group or the Melrose group.

### B. Summary of Evidence Not Presented at Trial

#### 1. Roy Ramsey

Ramsey was interviewed by both Foskett and the police several times prior to Rodriguez's trial, and also testified at the preliminary hearing. As noted, in spite of this, he did not testify at trial.

On June 17, 1998, Ramsey testified at the preliminary hearing as follows. On March 3, 1998, he was hanging out on the sidewalk on Melrose Avenue with his friends, Breshell and Alberty. A station wagon (the Walker station wagon) drove past the Melrose group, made a u-turn and parked on 48th Avenue. Eight to ten African–American teenagers exited the station wagon and approached the Melrose group. The Walker group hovered near the Melrose group without saying anything for approximately five minutes.

The Walker group then began demanding money from members of the Melrose group, and going through the Melrose group members' pockets. Ramsey gave the Walker group three bags of marijuana. Ramsey, however, did *not* give the Walker group the "couple hundred" dollars he had on him. Ramsey did not see any weapons on the Walker group. After he gave the Walker group his marijuana, Ramsey walked across the street to where Rodriguez was standing, and told Rodriguez that he had just been robbed.

Ramsey then yelled at the Walker group to leave Jackson, another member of the Melrose group, alone. At that point, the altercation between the Walker group and Jackson, Breshell, and Alberty heated up. Jackson and Breshell were trading punches with the Walker group.

Ramsey's gun was somehow transferred from Ramsey to Rodriguez, and Rodriguez shot the gun in the air five times. When Rodriguez finished shooting, he gave the gun back to Ramsey. Ramsey then disposed of the gun in a trash can three blocks away.

Prior to trial, Foskett was unable to easily locate Ramsey. After phone calls, visits to Ramsey's prior addresses, and interviews with Ramsey's friends and family, it became obvious that Ramsey was trying to evade service of the subpoena. Rodriguez's trial counsel then instructed Foskett to discontinue his efforts to subpoena Ramsey.

His trial counsel also decided not to seek to introduce Ramsey's preliminary hearing testimony at trial. As noted, she later advised Rodriguez's appellate counsel that she made this decision because she viewed the preliminary hearing testimony as "too thin."

### 2. Vonree Alberty

Alberty did not testify at trial and was not interviewed prior to trial.

In his declaration, Alberty stated that he was hanging out on Melrose Avenue with Jackson and Breshell on the day of the shooting. Jackson and Alberty were in the car while Breshell stood next to the car on the sidewalk. Ramsey was on Melrose Avenue, but was not necessarily in or next to the car at the time.

Alberty observed the Walker car drive by with approximately ten people in it. He lost sight of the car when it turned onto 48th Avenue. A little later, Alberty saw the same group of people walking down the sidewalk towards Jackson's car. Alberty thought that something was suspicious so he got out of the car. The two groups exchanged small talk, but the Walker group seemed to be acting suspiciously to Alberty.

Alberty stated that Ramsey seemed to be avoiding the Walker group. After talking with Alberty for a bit, the Walker group then started to walk away. Alberty got back in the car with Jackson. However, the Walker group did not leave, but instead formed a huddle and began whispering to each other. The Walker group then split into several groups: two went to Jackson's side of the car, two went to Breshell, two were on the sidewalk behind Alberty's car door, and three or four more were somewhere behind the car. Hawkins, a member of the Melrose group, was also present at this point.

The Walker group then aggressively questioned Jackson and Alberty about whether they had any drugs. Alberty stated that the Walker group was attempting to rob them. Alberty did not see any weapons, though. Alberty then saw Breshell start pushing and slapping the two guys surrounding him. Alberty was not sure whether they were fighting or whether the Walker group was trying to rob Breshell. Alberty, who had since gotten back into the car, then jumped out of the car again to help Breshell. He started fighting with the Walker group.

Alberty heard four shots come from behind him. He believed these shots came from the Walker group. Alberty then heard another four shots come from a different direction, shot from a seemingly different caliber gun. Everyone dropped to the ground at the sound of the gunshots. When the shots stopped, Alberty stood up and noticed someone on the ground. He was laying in the area where Alberty believed the shots originated.

The Walker car then pulled up, members of the Walker group got into the car, and the car left the scene. Similarly,

Jackson and Alberty drove away from the scene.

Alberty also recounted a threatening experience he had with the Walker group a few months after the shooting. Alberty was identified by members of the Walker group while he was at a store. The members of the Walker group then followed Alberty to his neighborhood. While Alberty hid in his sister's house, he saw the members of the Walker group searching the neighborhood for him. Alberty stated that he observed all of the members of the search group with guns.

### 3. Kenneth Jackson

Jackson did not testify at trial and like Alberty, he also was not interviewed by the defense prior to trial.

In his declaration, Jackson stated that prior to the shooting, he was hanging out, sitting in his parked car on Melrose Avenue. Ramsey, Alberty, and Breshell were hanging out with him in and around the car. At some point, Ramsey moved down the street, Alberty got in the passenger side of Jackson's car, and Breshell remained next to the car.

Jackson then saw a station wagon occupied by nine people, the Walker car, drive by. As they drove by, Jackson noticed that they looked at the Melrose group aggressively. The Walker car made a u-turn on 48th Avenue and parked near the corner. Hawkins, another member of the Melrose group, was close to the Walker group as they got out of their car at the corner.

The Walker group started to approach the Melrose group. Five members of the Walker group surrounded Ramsey, two remained close to where they had parked their car, and two more approached Jackson's car. At this point, Jackson noticed that the members of the Walker group were carrying open bottles of alcohol, and that the two who were approaching Jackson's car briefly stopped to urinate on a lawn. The members of the Walker group who were not surrounding Ramsey appeared to Jackson to be acting as lookouts.

In his car's rearview mirror, Jackson saw Ramsey giving the contents of his pockets to a member of the Walker group. Then, a member of the Walker group pulled the station wagon into the middle of the street and parked it behind Jackson's car. The driver got out of the station wagon and aggressively approached Jackson. Jackson stated that he understood this person's actions as an attempt to rob him.

Jackson then heard Ramsey yell to the driver that Jackson didn't have any drugs and that the Walker group should leave Jackson alone. Apparently in response, the driver then approached Breshell instead. Other members of the Walker group who had previously been acting as lookouts also approached Breshell at this point. Breshell then punched the driver of the Walker group in the face.

Jackson and Alberty began to exit the car to help Breshell. However, as soon as they got out of the car, Jackson heard a gunshot. Jackson ducked, got back in his car, and started the engine. Jackson then heard two more shots. Alberty got back in the car, and Jackson and Alberty drove away.

Jackson stated that he did not see any guns on the Walker group.

### 4. Dennis Lyons

Foskett interviewed Lyons prior to trial on May 3, 1999. Lyons stated that he was present when the shooting occurred on March 3, 1998. Lyons was hanging out with friends on Melrose Avenue when the Walker station wagon approached. The

station wagon stopped, and "a lot of guys" exited the car. Lyons saw that at least one of them had a gun.

Lyons observed the Walker group rob Ramsey and then commence robbing Breshell, but Breshell fought back. At this point, Lyons knew there was going to be trouble because the Walker group was armed and committing robberies, so he started to walk away. As he was walking away, he heard gunshots and turned to look back. He saw people scattering. He then ran down the street to escape.

Lyons thought that the Walker group had done the shooting. He only learned later that it was Rodriguez who shot the gun.

Foskett also had trouble finding Lyons to serve the subpoena for the January 11, 2000 court date. Similar to Ramsey, he made phone calls, visited Lyons' prior addresses and questioned Lyons' friends and family. For reasons unexplained, Weaver later told Foskett to cease efforts to locate Lyons prior to the time when the final prosecution witness testified at Rodriguez's trial.

### 5. Elaine Caufield

Foskett interviewed witness Elaine Caufield on May 7, 1999. Caufield, who lived on Melrose Avenue, was sitting in her front room with her windows open on the day of the shooting. At some point the voices became louder and the Walker car arrived and parked in front of her house. Caufield went out onto the sidewalk. Five African–American males exited the Walker car and approached the Melrose group. She then saw a fight and some shooting. She observed one of the African–American males with a gun in his right hand. After she heard two shots, she looked up and saw this individual put the gun behind his back. The police arrived shortly thereafter but did not detain the person with the gun. Instead, Caufield observed him get back into a car and leave the scene.

Prior to trial, defense counsel asked Foskett to find and subpoena Caufield. Foskett located Caufield in the hospital. When Weaver learned that Caufield was in the hospital, she instructed Foskett not to serve her with a subpoena, and Caufield therefore was not called to testify at trial.

### C. Parties' Arguments

As noted, Rodriguez does not challenge the fact that he shot Walker. Rather, he challenges his trial attorney's failure to adequately investigate witnesses and to present evidence and testimony to the jury that he claims would have justified his use of deadly force.

Rodriguez's ineffective assistance claim concerns essentially three groups of percipient witnesses discussed above: (1) Caufield and Lyons, witnesses who were identified, interviewed, but not subpoenaed to testify at trial; (2) Jackson and Alberty, witnesses who were never identified nor interviewed by the defense, and, therefore, were never subpoenaed to testify at trial and (3) Ramsey, the witness who was identified, interviewed, and testified at the preliminary hearing but who was *not* subpoenaed to testify at trial and whose preliminary hearing testimony trial counsel did not seek to introduce at trial.

Rodriguez argues that trial counsel's failure to put these five additional witnesses on the stand during the trial constituted ineffective assistance of counsel. He contends that the corroborative nature of these five witnesses' potential testimony would have overcome the prosecution's efforts to discredit the testifying defense witnesses' credibility. In short, Rodriguez argues that the additional five witnesses' cumulative testimony would have presented a clearer picture of the aggressiveness

and dangerousness of the Walker group to the jury, thereby bolstering Rodriguez's defense of justified use of deadly force.

Specifically, regarding the first group, Caufield and Lyons, Rodriguez's trial counsel asked Foskett to find and subpoena Lyons and Caufield on January 5, 2000 for a January 11, 2000 court date. Rodriguez asserts that the relatively short time period that Weaver gave Foskett to find and serve these witnesses made it extremely difficult for Foskett to successfully do his job. Moreover, trial counsel, without explanation, later ordered Foskett to cease efforts to find and serve Lyons. Similarly, when trial counsel learned that Caufield was in the hospital, she ordered Foskett to make no further attempts to subpoena Caufield; she also did not make alternative arrangements to have Caufield's testimony preserved and admitted at trial. Additionally, Rodriguez argues that Weaver herself had not talked to Lyons or Caufield, so it was impossible for her to evaluate the necessity of their testimony at trial.

Rodriguez argues that testimony from Lyons and Caufield could have established that the Walker group was armed and acting aggressively at the time of the shooting. Rodriguez contends that even if these witnesses' testimony was cumulative of defense witness Breshell's testimony, they were nevertheless necessary because the prosecution called into question Breshell's credibility and the defense needed to provide corroboration of his testimony. Additionally, Rodriguez asserts Caufield and Lyons would have been regarded as more objective than Breshell, the testifying defense witness, because they were not friends with Rodriguez.

Regarding the second group, Jackson and Alberty, Rodriguez contends they would have established that the Walker group was robbing Ramsey and Breshell

when the shooting occurred. As for any suggestion that Jackson and Alberty could not be located at the time of trial, Rodriguez argues that this is speculative and that there is no indication that the defense ever attempted to locate Jackson or Alberty. Rodriguez further contends that even if Jackson and Alberty's testimony may have been cumulative to Breshell's, it was necessary to bolster Breshell's credibility.

Regarding Ramsey, Rodriguez asserts that Weaver's failure to introduce his testimony left the defense without any corroborating evidence that Rodriguez in fact thought that Breshell was being robbed. Rodriguez notes that Ramsey was the person who advised him that he had been robbed, and that Ramsey also advised Rodriguez that Breshell was being robbed. Because Ramsey never testified, Rodriguez argues the defense never produced evidence at trial that Ramsey had actually been robbed before the shooting, and this undermined the defense strategy of justified use of deadly force.

In sum, Rodriguez contends that the crux of his defense strategy was to convince the jury that his friends were being robbed by the Walker group, and that the resulting danger to his friends justified or mitigated his use of deadly force. According to Rodriguez, trial counsel's failure to investigate and present sufficient testimony to support the justified use of deadly force defense allowed the prosecution to shift the focus of the case. Instead of focusing on the threatening circumstances prior to the shooting, the trial focused on the shooting itself. He argues that because justified use of deadly force was a central aspect of his defense, "competent [defense] counsel would have made a strong effort to locate and interview all percipient witnesses."

In response, regarding the first group of witnesses, the state argues that Weaver's

investigator, Foskett attempted to subpoena both Caufield and Lyons, but that he was unsuccessful for various reasons. As for Caufield, the state asserts that Foskett located Caufield in the hospital and that she was apparently incapable of coming to court. Therefore, according to the state, it was reasonable for Weaver not to pursue Caufield as a witness because of her general unavailability. Additionally, the state argues that the statement that Caufield gave to Foskett was unclear as to which group was armed. Further, the state argues that even if the defense could establish through Caufield's testimony that the Walker group was armed, it would have been merely cumulative of Breshell's testimony.

Regarding Lyons, the state notes that the trial began on January 4, 2000, and that Foskett made several attempts to locate Lyons between January 5 and January 9, 2000. The state argues that reasonable counsel could conclude that even if Lyons could have been found, it would have been too late in the course of the trial to adequately prepare him to testify, and therefore it was reasonable for counsel to direct Foskett to cease his efforts to find and serve Lyons. Additionally, the state argues that Lyon's testimony would have been cumulative of Breshell's testimony and was, therefore, unnecessary for the defense.

Turning to Alberty and Jackson, the state argues that their current declarations do not establish that Rodriguez's trial counsel was ineffective for failing to locate them and call them as witnesses. It contends that their willingness to cooperate with Rodriguez's defense at this point—ten years after the shooting—may not be indicative of their willingness to cooperate at the time of trial. Furthermore, the state argues that their testimony is merely cumulative of Breshell's testimony and would

not have changed the outcome of the trial even if the defense had successfully located and subpoenaed them.

Finally, regarding Ramsey, the state notes that Weaver did ask Foskett to subpoena Ramsey, and that Foskett made several attempts to find Ramsey. The state suggests that Ramsey was not successfully subpoenaed because he was actively evading service. Therefore, it argues that the only real issue is Weaver's failure to introduce Ramsey's preliminary hearing testimony at trial. It contends that counsel's decision not to introduce Ramsey's preliminary hearing testimony was reasonable because Ramsey's prior testimony conflicted on several key points with Rodriguez's trial testimony. As a result, according to the state, the prosecution could have emphasized the conflicting nature of the testimony, Ramsey's bias as Rodriguez's friend, and Ramsey's criminal history to attack his credibility. Furthermore, the state argues that the benefits of Ramsey's prior testimony would have been marginal, and asserts that it would have been merely cumulative.

## D. Analysis

### 1. Legal Standards

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88, 104 S.Ct. 2052. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694,

104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Harrington v. Richter,* — U.S. —, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011); *Premo v. Moore,* — U.S. —, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011) (same). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington,* 131 S.Ct. at 788.

A showing that counsel's performance was deficient requires demonstrating that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The defendant must show that counsel's representation fell below an objective standard of reasonableness. *See id.* at 688, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.* at 689, 104 S.Ct. 2052. The United States Supreme Court recently reaffirmed that

> [a]lthough courts may not indulge *post hoc* rationalizations for counsel's decisionmaking that contradicts the available evidence of counsel's actions, ... neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others

reflects trial tactics rather than sheer neglect.

*Harrington,* 131 S.Ct. at 789.

Second, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The test for prejudice is not outcome-determinative, i.e., defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693, 104 S.Ct. 2052. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052.

If the state's case is weak, the potential prejudicial effect of counsel's performance must be evaluated in light of that fact. *See Johnson v. Baldwin,* 114 F.3d 835, 838 (9th Cir.1997). After all, if the state's case is weak there is a greater likelihood of a reasonable probability that the result of the trial would have been different. *See id.* at 839–40.

### a. Failure to Investigate

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Pinholster,* 131 S.Ct. at 1407. *Strickland* directs that " 'a particular deci-

**1084**

sion not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford,* 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. *See Richter,* 131 S.Ct. at 789–90. Assuming counsel should have found and presented additional evidence, a state court's rejection of a claim of ineffective assistance based on counsel's failure to pursue further investigation is reasonable if the additional evidence would not likely have caused the jury to reach a different verdict. *See Samayoa v. Ayers,* 649 F.3d 919, 927–29, 2011 WL 1226375 at *10–11 (9th Cir. Apr. 4, 2011) (affirming state court's rejection of claim of ineffective assistance where no reasonable probability of different outcome for penalty phase of capital trial given that additional mitigating evidence counsel failed to present about petitioner's difficult childhood does not outweigh overwhelming aggravating evidence).

 A claim of negligence in conducting the pretrial investigation can form the basis for a claim of ineffective assistance. *See United States v. Tucker,* 716 F.2d 576 (9th Cir.1983). Counsel must, at a minimum, conduct a reasonable investigation enabling her to make informed decisions about how best to represent her client. *Avila v. Galaza,* 297 F.3d 911, 924 (9th Cir.2002) (failure to conduct reasonable investigation, despite virtual certainty that defendant did not commit the crime, constituted deficient performance); *Sanders v. Ratelle,* 21 F.3d 1446, 1457 (9th Cir.1994) (failure to investigate leading to uninformed decision not to call witness who had admitted to committing crime not a strategic decision).

 The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir.1995). A claim of failure to interview a witness cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel. *Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir.1986). When the record shows that the lawyer was well-informed and the defendant fails to state what additional information would be gained by the discovery he now claims was necessary, an ineffective assistance claim fails. *Id.* However, defense counsel's failure to pursue corroborating evidence through an adequate pretrial investigation can establish constitutionally deficient performance. *Hendricks,* 70 F.3d at 1040.

 To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witness' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford,* 334 F.3d 862, 872–73 (9th Cir. 2003).

### b. Trial Tactics

 Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *See Sanders,* 21 F.3d at 1456. Whether counsel's actions were indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law considered under 28 U.S.C.

§ 2254(d)(1). *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007).

▮▮▮▮ The investigation itself must be reasonable for an attorney's tactical decision based on that investigation to be reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523–24, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (tactical decision not to present life history as mitigating evidence in capital sentencing trial unreasonable where counsel failed to follow up on evidence that defendant had a miserable childhood). However, federal courts should not overlook the "wide latitude counsel must have in making tactical decisions;" therefore, there are no "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Pinholster*, 131 S.Ct. at 1406–07 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . .") (quoting *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052). A court must consider not only the quantum of evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 526–27, 123 S.Ct. 2527; *see also Pinholster*, 131 S.Ct. at 1407 (counsel not deficient in failing to further investigate and present mitigating evidence of petitioner's mental disorder and negative family history in capital sentencing trial because it was "reasonable for attorneys to conclude that creating sympathy for the defendant's *family* is a better idea because the defendant himself is simply unsympathetic").

▮▮▮▮ Evidence that the challenged trial conduct resulted from inattention rather than from strategic considerations may also be relevant to the inquiry. *Wiggins*, 539 U.S. at 524–25, 123 S.Ct. 2527 (noting that counsel represented to the court and to the jury in opening statements that they would present a mitigation case based on defendant's difficult life; failure to present such evidence, therefore, likely resulted from inattention rather than strategic decision). *see also Rompilla v. Beard*, 545 U.S. 374, 380–92, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (even when a capital defendant's family members and the defendant himself suggested that no mitigating evidence was available, his lawyer was bound to make reasonable efforts to obtain and review material that counsel knew the prosecution would probably rely on as evidence of aggravation at the trial's sentencing phase); *Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir.1998) (court evaluates failure to investigate or produce evidence for "strategic reasonableness"). Evaluation of the two duties overlaps: counsel cannot satisfy the duty to select a defense when counsel does not investigate the best defense, but counsel may fail to investigate a particular defense and still present the best one. *Mickey v. Ayers*, 606 F.3d 1223, 1236–37 (9th Cir.2010).

▮▮▮▮ To determine prejudice in a case where counsel failed to make a reasonable investigation to support a tactical decision, the Supreme Court considered whether a reasonable attorney would have made a different tactical decision if he had conducted a reasonable investigation, and whether there was a reasonable probability that the jury would have reached a different verdict had the attorney pursued the alternative strategy. *Wiggins*, 539 U.S. at 536–38, 123 S.Ct. 2527. In making the latter determination, a reviewing court must evaluate the totality of the evidence. *Id.; see, e.g., Rompilla*, 545 U.S. at 389–92, 125 S.Ct. 2456 (where state court never reached prejudice element of *Strickland* claim, Court examined element de novo and concluded that counsel's failure to examine defendant's prior conviction file was prejudicial to penalty phase of capital trial

because examination of file would have uncovered a range of mitigation leads which, taken as a whole, might well have influenced the jury's appraisal of defendant's culpability).

## 2. Rodriguez is Entitled to Relief on his Ineffective Assistance of Counsel Claim as it Pertains to Alberty, Jackson, and Ramsey

At the outset, the court makes two important observations. First, the court notes that none of the state courts—in either round of state habeas review—articulated their rationale for their denial of Rodriguez's ineffective assistance of counsel claim, but instead simply issued summary or postcard denials. Accordingly, this court is required to conduct an independent review of the record and the relevant federal law to determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law." *See Delgado*, 223 F.3d at 981–82.

Second, the court notes that there is no explanation from trial counsel herself in the record before this court or before the state courts regarding the reasons, if any, underlying her failure to investigate or introduce evidence at trial. In her May 24, 2003 declaration submitted to the state courts in conjunction with Rodriguez's petitions for habeas relief—part of the record before this court—Rodriguez's state appellate counsel, Sandra Gillies, notes that she sent trial counsel a declaration to sign, but that trial counsel failed to return the declaration. Accordingly, given the absence of any such declaration from trial counsel, there is very little, if anything, in the record regarding her reasons and/or trial strategy.[8]

### a. Lyons and Caufield

■ The court concludes that Rodriguez has not demonstrated that trial counsel's performance was deficient when she chose to cease efforts to subpoena, and thus pursue trial testimony from Lyons and Caufield, given that neither Lyons nor Caufield were available to testify at trial. Foskett believed that Lyons was trying to evade service, and Caufield was hospitalized. However, even if Weaver's performance could be considered deficient with respect to these two witnesses, the court nevertheless concludes that Rodriguez is unable to demonstrate prejudice with respect to Lyons and Caufield.

■ Neither Caufield nor Lyons offered testimony as helpful or specific as the other witnesses at issue here. Lyons' role or placement at the scene is difficult to comprehend, and he is not mentioned by any other witness in this case. The only time the record reflects his existence is in the interview report prepared by Foskett.

Likewise, Caufield's testimony is difficult to understand. Her interview report is fairly vague. She states that at least one member of the fighting groups was armed, but she was unaware of the identities of any of the involved parties. Therefore, it is almost impossible to ascertain from her interview report who she believed were the aggressors, who was armed, or other facts significant to Rodriguez's defense. Additionally, neither

---

**8.** It is this court's experience that in the state record the court receives in conjunction with the federal habeas proceedings, trial counsel routinely provide declarations reflecting their trial strategy, in support of or even in opposition to, habeas petitions raising ineffective assistance of counsel claims. There is often no means of assessing tactical decisions and the court finds them very helpful in resolving these claims. Unfortunately, here, trial counsel chose not to supply a declaration even when asked to do so, and the court is left to essentially guess as to her trial strategy, if any.

Lyons nor Caufield communicated with Rodriguez prior to the shooting their belief that the Walker group was armed.

In sum, the main purpose of having these two witnesses testify would have been to corroborate the defense witnesses' account of the robbery and the events leading up to the shooting. Rodriguez, however, has not sufficiently shown that Lyons and Caufield would have given the proffered testimony or that there is a reasonable probability that the jury would have reached a verdict more favorable to him had they testified at trial. For these reasons, his federal habeas claim fails to the extent it is based on the failure to present these two witnesses.

### b. Jackson and Alberty

As noted, the record simply does not reflect any effort by the defense to contact and interview Alberty and/or Jackson prior to trial. This is in spite of the fact that it may be inferred that the defense was aware of their existence because both defense witnesses, Breshell and Rodriguez, referred to Alberty and Jackson in their testimony at trial. In fact, both Alberty and Jackson attest in their declarations that they were never contacted by or talked to the police or the defense about Rodriguez's case prior to his trial.

■ The court finds it extremely problematic that defense counsel never even identified, much less interviewed Alberty and Jackson, or secured their testimony for trial. Alberty and Jackson were not tangential participants in the shooting; rather, they were intricately involved in the entire altercation between the Walker and Melrose groups prior to the shooting. Their interviews represent exactly the type of corroborative investigation that reasonably competent counsel would conduct. *See Tucker*, 716 F.2d at 594.

Moreover, it appears that counsel's failure to present their testimony resulted not from a strategic decision but from inattention. *See Avila*, 297 F.3d at 920 (holding that failure to present certain witnesses' testimony is not a valid strategic decision when attorney never investigated witnesses' background or what testimony they could provide). The lack of record evidence regarding a strategic choice by counsel *not* to present evidence from Alberty and Jackson distinguishes this case from the United States Supreme Court's recent decision in *Pinholster*. *See* 131 S.Ct. at 1404 (noting that record supported fact that death penalty petitioner's counsel acted strategically in presenting "family sympathy" mitigation defense); *see also Richter*, 131 S.Ct. at 789–90.

Accordingly, the court finds that counsel's performance was deficient under the first prong of the *Strickland* analysis when she failed to investigate Jackson and Alberty, thus precluding introduction of their testimony at Rodriguez's trial.

■ Additionally, the court concludes based on the totality of the evidence, that there is a reasonable probability that the jury would have reached a different result had Jackson and Alberty testified. Testimony from Alberty and Jackson would have supported defense witness Breshell's testimony about the general danger and aggressiveness posed by the Walker group. This corroboration was particularly important since the prosecution tried to discredit Breshell throughout the trial. If Rodriguez was going to successfully argue justified use of deadly force as a defense, he needed more than Breshell's and his own testimony.

Testimony from Jackson and Alberty would have undoubtedly added weight to Breshell's explanation of the threatening situation. Jackson and Alberty's accounts were fairly consistent with one another

and with the other testimony presented. If Jackson and Alberty had testified, it is unlikely that inconsistencies in their testimony would have acted to discredit their perception of the incident because the inconsistencies between their testimony were minor and their testimony was broadly consistent with the facts as introduced at trial.

Additionally, in concluding that Rodriguez has demonstrated prejudice, the court notes that the prosecution's case was relatively weak regarding whether the use of deadly force was justified. Neither prosecution witness Salazar nor Marshall actually observed the crucial few minutes immediately preceding the shooting. Marshall initially looked out his window when he heard loud conversation but turned away from the window and went about his business when he did not see a fight. Marshall only went back to his window "five minutes, give or take" later when he heard gunshots. Similarly, Salazar saw the Walker group when they first arrived on Melrose Avenue because Salazar was in his vehicle in the street. However, he then entered his house and told his wife to gather the kids from the backyard because the unfamiliar teenagers made him nervous. After entering his house, Salazar did not look outside his kitchen window to see what was happening in the street until "about three to four minutes" later when he heard gunshots.

Although it is difficult for the court to make any definitive determination about whether Alberty and Jackson would have been available to testify at trial had defense counsel identified and contacted them, the court concludes that based on the absence of an explanation in the record otherwise, including any evidence they were evading service, any issue regarding their availability should be resolved in Rodriguez's favor, given his successful showing on the other two elements of prejudice.

For these reasons, the court concludes that Rodriguez is entitled to habeas relief based on his counsel's failure to investigate and introduce testimony from Alberty and Jackson.

### c. Ramsey

Rodriguez essentially claims that Weaver's performance regarding Ramsey was deficient in two respects: (1) she failed to attempt to subpoena Ramsey for trial in a timely manner, and she should not have ceased defense efforts to locate Ramsey and secure his trial testimony; and (2) in the absence of live testimony from Ramsey, counsel should have attempted to introduce his preliminary hearing testimony at trial.

### i. Sub–Claim One: Failure To Timely Subpoena Ramsey

■ This sub-claim is a close call, but the court ultimately concludes that Rodriguez is unable to demonstrate deficient performance or prejudice. It is unlikely that trial counsel's failure to successfully subpoena Ramsey constituted deficient performance in light of the fact that Ramsey was evading service. The deficiency in defense counsel's performance with respect to Ramsey instead appears to have stemmed from her failure to utilize at trial the evidence available to her—Ramsey's preliminary hearing testimony.

Rodriguez is likewise unable to demonstrate prejudice because he cannot show that Ramsey would have been available to testify. Ramsey was actively avoiding service; thus, there was no guarantee that Foskett could have located Ramsey even if defense counsel had provided him with additional time and/or had not instructed him to cease his efforts to locate Ramsey.

### ii. Sub–Claim Two: Failure to Introduce Ramsey's Preliminary Hearing Testimony

█] Unlike witnesses Alberty and Jackson discussed above, trial counsel appears to have made a tactical decision not to introduce Ramsey's preliminary hearing testimony. She apparently read the testimony and decided that it was "too thin." However, the court finds the circumstances here distinguishable from the Supreme Court's recent decisions in *Pinholster* and *Richter*. *Pinholster*, 131 S.Ct. at 1404; *Richter*, 131 S.Ct. at 789–90. Unlike counsel in those cases, trial counsel's tactical decision here is *not* entitled to deference because it was not reasonable under the circumstances. If counsel had introduced *any* evidence supporting Rodriguez's assertion that members of the Melrose group had in fact been robbed by the Walker group, it would be a different story. However, she did not introduce any such evidence, and Rodriguez's own testimony to that effect was not admitted for the truth. Thus, the prosecution was able to argue—and did argue during closing arguments—that there was absolutely no evidence that a robbery had occurred, thereby undermining Rodriguez's defense that he justifiably used deadly force to prevent Walker from robbing his friends.

Trial counsel's failure to seek to introduce any corroborating evidence that Ramsey had been robbed and that Ramsey had communicated this information to Rodriguez prior to the shooting left a huge hole Rodriguez's defense. Accordingly, Rodriguez has shown deficient performance under the first prong of the *Strickland* analysis for this sub-claim regarding Ramsey.

█ The court also concludes that counsel's failure to introduce Ramsey's preliminary hearing testimony was prejudicial. This is in large part based again on the weakness of the prosecution's case. The record reveals that the prosecution presented no real motive for the murder in this case. Given the absence of any motive, it was essential that the defense present evidence regarding the robberies that were alleged to have been committed by the Walker group, and which provided Rodriguez's explanation for the shooting.

There is a reasonable probability that the introduction of Ramsey's preliminary hearing testimony would have impacted the jury's verdict in this case. Ramsey arguably constituted the most consequential witness because he was the only person involved in the altercation between the Walker group and the Melrose group to have communicated directly with Rodriguez prior to the shooting. Therefore, only Ramsey's testimony (in conjunction with Rodriguez's) could establish what information was available to Rodriguez when Rodriguez allegedly formed the belief that the use of deadly force was justified. Ramsey's preliminary hearing testimony would have provided the jury with evidence that the Walker group robbed Ramsey, and that Ramsey advised Rodriguez that he had been robbed. Such testimony would thus have forced the prosecution to focus more on the events preceding the shooting rather than the shooting itself.

Without Ramsey's testimony, the defense had no corroborating evidence or testimony that a robbery had occurred and that such information had been communicated to Rodriguez prior to the shooting. This lack of corroborating evidence, coupled with the relative weakness of the prosecution's case, supports the court's determination that the deficient performance was prejudicial. *See Johnson*, 114 F.3d at 838.

For these reasons, the court concludes that Rodriguez is entitled to habeas relief

based on his counsel's failure to introduce, or at a minimum, attempt to introduce Ramsey's preliminary hearing testimony.

## CONCLUSION

For the above reasons, the court GRANTS habeas relief on Rodriguez's ineffective assistance of counsel claim. Accordingly, Rodriguez's conviction is VACATED. The respondent shall release petitioner from custody unless the state commences proceedings to retry petitioner within one hundred and twenty (120) days of the date of entry of judgment on this order. The clerk shall send an informational copy of this order to the district attorney of Alameda County, in addition to the usual service on counsel of record. **IT IS SO ORDERED.**